# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANA BERKLEY, NINA PALLMAN, ETOYA GARRETT, SHAKIA MEANS, FARAH SANDERS, MARGARITE SAMPSON, CASANDRA MAYNARD, ALECIA BOWENS, TERRANCE MONTGOMERY, and SANDY SELESKY, individually and on behalf of all others similarly situated, | Case No.: 1:24-cv-00271-BKS-CFH |
| | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| vs. | **JURY TRIAL DEMANDED** |
| FAMILY DOLLAR STORES, INC., DOLLAR TREE, INC., DOLLAR TREE STORES, INC., FAMILY DOLLAR, INC., FAMILY DOLLAR, LLC, and FAMILY DOLLAR SERVICES, LLC, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ............................................................................1

II.   THE PARTIES ...........................................................................................12

    A.    Plaintiffs ......................................................................................12

         1.    New York Plaintiffs ...........................................................13

              a.    Dana Berkley ...........................................................13

              b.    Nina Pallman ...........................................................15

         2.    Texas Plaintiffs .................................................................16

              a.    Etoya Garrett............................................................16

              b.    Shakia Means ...........................................................17

              c.    Farah Sanders ..........................................................17

          3.    Louisiana Plaintiffs ...........................................................18

              a.    Margarite Sampson ..................................................18

              b.    Casandra Maynard ...................................................19

          4.    Tennessee Plaintiffs ..........................................................19

              a.    Alecia Bowens .........................................................19

              b.    Terrance Montgomery ...............................................20

          5.    Illinois Plaintiff ................................................................20

              a.    Sandy Selesky ..........................................................20

    B.    Defendants...................................................................................21

III.  JURISDICTION & VENUE .......................................................................22

IV.  FACTUAL ALLEGATIONS .....................................................................24

A.   FDA regulations ...................................................................24

B.   Background on Family Dollar and Dollar Tree ...............................28

C.   FDA warns Family Dollar about its putrid storage
     conditions. ........................................................................29

D.   Family Dollar routinely and unlawfully sells adulterated
     drugs and medical devices.....................................................35

     1.   Adulterated sales between May 1, 2022, and July
          21, 2022.....................................................................35

     2.   Adulterated sales between May 1, 2022, and
          August 5, 2022 ...........................................................36

     3.   Adulterated sales between May 1, 2022, and
          September 15, 2022.......................................................37

     4.   Adulterated sales between June 1, 2022, and May
          4, 2023.......................................................................37

     5.   Adulterated sales between June 1, 2023, and
          October 5, 2023............................................................38

     6.   Plaintiffs' own investigation reveals Family Dollar
          knew OTC medications were stored outside of
          acceptable temperature ranges. ......................................38

E.   Family Dollar's ongoing unlawful conduct ...................................42

F.   Injury to Plaintiffs and Class members from Family
     Dollar's unlawful conduct....................................................45

V.   TOLLING OF THE STATUTES OF LIMITATION ...................................50

A.   Discovery rule tolling...........................................................50

B.   Fraudulent concealment tolling..............................................51

C.   Estoppel ............................................................................51

VI.  CLASS ALLEGATIONS ..............................................................52

011231-12/2448713 V1

VII.   CAUSES OF ACTION.....................................................................................57

     A.    Multistate Claims ...............................................................................57

COUNT I NEGLIGENCE (ON BEHALF OF THE STATE
     CLASSES)...........................................................................................57

COUNT II NEGLIGENCE *PER SE* (ON BEHALF OF THE STATE
     CLASSES)...........................................................................................59

COUNT III NEGLIGENT FAILURE TO WARN (ON BEHALF OF
     THE STATE CLASSES)......................................................................61

COUNT IV NEGLIGENT MISREPRESENTATION (ON BEHALF
     OF THE STATE CLASSES) ...............................................................63

COUNT V UNJUST ENRICHMENT (ON BEHALF OF THE
     STATE CLASSES) ..............................................................................64

COUNT VI BREACH OF IMPLIED WARRANTY (ON BEHALF
     OF THE STATE CLASSES) ...............................................................66

     B.    Claims brought on behalf of the New York Class ..............................68

COUNT VII VIOLATIONS OF NEW YORK GENERAL
     BUSINESS LAW § 349 (N.Y. GEN. BUS. LAW § 349) ...........................68

COUNT VIII VIOLATIONS OF NEW YORK GENERAL
     BUSINESS LAW § 350 (N.Y. GEN. BUS. LAW § 350) ...........................72

     C.    Claims Brought on Behalf of the Arkansas Class...............................75

COUNT I  VIOLATIONS OF THE DECEPTIVE TRADE
     PRACTICE ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ.*) ...................75

     D.    Claims Brought on Behalf of the Illinois Class. .................................79

COUNT I  VIOLATION OF THE ILLINOIS CONSUMER FRAUD
     AND  DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS
     505/1 *ET SEQ.* AND 720 ILCS 295/1A) .......................................79

     E.    Claims Brought on Behalf of the Kentucky Class. ..............................83

011231-12/2448713 V1

COUNT I  VIOLATIONS OF THE KENTUCKY CONSUMER
          PROTECTION ACT (KY. REV. STAT. ANN. § 367.110
          *ET SEQ.*) .................................................................................83

      F.      Claims Brought on Behalf of the Louisiana Class. .............................86

COUNT I  VIOLATION OF THE LOUISIANA UNFAIR TRADE
          PRACTICES AND CONSUMER PROTECTION LAW (LA.
          STAT. ANN. § 51:1401 *ET SEQ.*) .................................................86

COUNT II  BREACH OF IMPLIED WARRANTY OF
           MERCHANTABILITY/ WARRANTY AGAINST
           REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520,
           2524) ...........................................................................................90

      G.      Claims Brought on Behalf of the Missouri Class. ..............................91

COUNT I  VIOLATIONS OF THE MISSOURI MERCHANDISING
          PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*) .......................91

      H.      Claims Brought on Behalf of the Oklahoma Class. ............................94

COUNT I  VIOLATION OF OKLAHOMA CONSUMER
          PROTECTION ACT (OKLA. STAT. TIT. 15, § 751 *ET SEQ.*) .................94

      I.      Claims Brought on Behalf of the Tennessee Class. ............................99

COUNT I  VIOLATIONS OF THE TENNESSEE CONSUMER
          PROTECTION ACT (TENN. CODE ANN. § 47-18-101
          *ET SEQ.*) .................................................................................99

      J.      Claims brought on behalf of the Texas Subclass .............................103

COUNT IX VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
          PRACTICES-CONSUMER PROTECTION ACT ("DTPA")
          (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)....................................103

PRAYER FOR RELIEF .....................................................................................107

DEMAND FOR JURY TRIAL ...........................................................................107

011231-12/2448713 V1

Plaintiffs Dana Berkley, Nina Pallman, Etoya Garrett, Shakia Means, Farah Sanders, Margarite Sampson, Casandra Maynard, Alecia Bowens, Terrance Montgomery, and Sandy Selesky (collectively, "Plaintiffs"), by and through their respective counsel, bring this action on behalf of themselves and all others similarly situated, against Defendants Family Dollar Stores, Inc.; Dollar Tree, Inc.; Dollar Tree Stores, Inc.; Family Dollar, Inc.; Family Dollar, LLC, and Family Dollar Services, LLC (collectively, "Family Dollar" or "Defendants"). Plaintiffs allege the following based upon personal knowledge as to themselves, facts that are a matter of public record, and upon information and belief, as follows:

## I.    NATURE OF THE ACTION

1.     Family Dollar is a self-described value chain that sells over-the-counter ("OTC") drugs, medical devices, health and personal care products, and other critical household goods to millions of "lower than average income customer[s] in urban and rural locations."[1] Family Dollar acknowledges its "unique customer bases"[2] and promotes itself as the "neighborhood discount store[.]"[3] Low- and fixed-income consumers depend on Family Dollar for their daily needs, and Family Dollar

---

[1]    Dollar Tree, *2022 Annual Report* at 11, Mar. 10, 2023, https://corporate.dollartree.com/_assets/_94f0e7ffaf23dfcf737ba030ee70c8d8/dollartreeinfo/db/893/9552/annual_report/Dollar+Tree+-+2022+Annual+Report.pdf.

[2] *Id.* at 4.

[3]    Family Dollar, *Our Brands*, https://corporate.dollartree.com/about/our-brands/family-dollar (last visited Feb. 23, 2024).

promises consumers that "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."[4] Family Dollar has approximately 8,200 retail stores in 48 states, along with numerous distribution centers, and is wholly-owned by Dollar Tree, Inc., a Fortune 500 company.[5]

2.      Based on the strategic placement of Family Dollar's retail stores in rural and underserved communities, consumers frequently have few or no other viable alternatives for purchasing their daily necessities. As one leading professor on the economics of dollar stores explained, "[t]he core of what dollar stores have done and really capitalized on is recognizing that there are people who really don't have other options."[6] The Institute for Local Self-Reliance, a think tank dedicated to self-sustaining communities, found that "dollar stores target low-income neighborhoods, especially Black neighborhoods, and drive out grocers and other healthy eating options."[7]

3.      In addition, as a seller of medical products, Family Dollar has a relationship of trust with its consumers who purchase these products. When describing its relationship with consumers, Family Dollar consistently asserts that

---

[4] *Id.*

[5] Dollar Tree, *2022 Annual Report*, at 6-7.

[6] Brandon A. Dorgman, *How Dollar Stores Sell Low-Income People a Sense of Belonging*, Talk Poverty, Feb. 19, 2020, https://talkpoverty.org/2020/02/19/dollar-stores-sell-low-income-people-sense-belonging/index.html.

[7] *Id.*

- 2 -

"[h]elping families save on the items they need with everyday low prices creates a strong bond with customers who refer to their neighborhood store as 'my Family Dollar.'"[8]

4.     Family Dollar has abused and exploited this position of trust throughout the country by unlawfully distributing and selling millions of dollars of adulterated OTC drugs and medical devices to low- and fixed-income consumers, despite having notice and knowledge that these products could not lawfully be sold, were unsafe for human use or ingestion, and were defective.  As detailed herein, these products did not meet safety, strength, quality, purity, and effectiveness requirements because they were stored in extreme temperatures that are outside of labeled temperature requirements (the "Adulterated Products" or "Products").  These requirements are so important that they are often listed on the packaging, as shown on this box of Advil:

---

[8] Press Release, *Family Dollar Grand Opening*, City News, Oct. 11, 2017, https://www.kossetexas.com/news/family-dollar-store-grand-opening.



5.     Although this case centers on the storage of Adulterated Products outside acceptable temperature ranges, problems at Family Dollar facilities have been endemic for years.  In late January 2022, following a news report showing a Family Dollar employee feeding a rat potato chips inside its West Memphis, Arkansas Distribution Center,[9] the U.S. Food and Drug Administration ("FDA") began a series of inspections at this Center and issued a scathing 22-page Inspection Report detailing the deplorable conditions it observed.[10] The FDA inspections led to the unsettling discovery of more than *1,100 dead rodents*, and a review of the company's internal records revealed the collection of "*more than 2,300 rodents*

---

[9] Melissa Moon, *Another complaint about rats at Family Dollar Facilities*, WREG Memphis, Jan. 4, 2022, https://wreg.com/nes/local/another-complaint-about-rats-at-family-dollar-facilities/.

[10]     FDA, *Inspection Observations*, Feb. 11, 2022, https://www.fda.gov/media/156960/download (the "Inspection Report") (attached as **Exhibit A**).

- 4 -

*between Mar. 29 and Sep. 17, 2021, demonstrating a history of infestation*."[11] The Inspection Report also revealed that Family Dollar had prior knowledge of the appalling and pervasive rodent infestation.[12] On February 18, 2022, after the FDA issued a "Safety Alert" warning the public to potentially contaminated products and announced that it had found unsanitary and dysfunctional conditions that "appear to be violations of federal law,"[13] Family Dollar initiated a recall[14] and temporarily closed 404 stores in six states.[15]

6.      These squalid conditions prompted a multidistrict litigation proceeding in Tennessee,[16] which resulted in a settlement for Family Dollar consumers in six states who purchased contaminated products between January 2021 and February

---

[11] FDA News Release, *FDA Alerts the Public to Potentially Contaminated Products from Family Dollar Stores in Six States*, at 2, FDA, Feb. 18, 2022, (attached as **Exhibit B**) (emphasis added).

[12] *See* Inspection Report, Ex. A, at 14 ("Specifically, your firm has documentation since at least January 2020 of rodents (mice and/or rats) within your facility.").

[13] FDA Safety Alert, Ex. B, at 1.

[14] Company Announcement, *Family Dollar Stores Issues Voluntary Recall of Certain FDA-Regulated Products in Six States Including Drugs, Devices, Cosmetics, Food*, FDA, *Feb.* 18, 2022, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/family-dollar-stores-issues-voluntary-recall-certain-fda-regulated-products-six-states-including (attached as **Exhibit C**).

[15] Sam Tabahriti, *Family Dollar is temporarily closing 404 stores after more than 1,000 dead rats were found in a distribution center*, Business Insider, Feb. 23, 2022, https://www.businessinsider.com/family-dollar-indefinitely-closed-stores-finding-thousands-rodents-2022-2.

[16] *See In re: Family Dollar Stores, Inc. Pest Infestation Litig.*, 22-md-03032 (W.D. Tenn.).

2022.[17] Pursuant to the settlement, Family Dollar assured consumers that it was taking steps "to prevent issues like those alleged to have occurred at the West Memphis Distribution Center from occurring in the future."[18]

7.      Finally, based on this rat infestation, on February 26, 2024, Family Dollar Stores LLC pled guilty to one count of causing FDA-regulated products to become adulterated while being held under unsanitary conditions.  Pursuant to the plea agreement, Family Dollar agreed to pay a fine and forfeiture totaling over $41.6 million.  According to the U.S. Department of Justice, this is "the largest-ever monetary criminal penalty in a food safety case."[19]  As the U.S. Attorney for the Eastern District of Arkansas explained, "[i]t is incomprehensible that Family Dollar knew about the rodent and pest issues at its distribution center in Arkansas but continued to ship products that were unsafe and unsanitary.  Knowingly selling these types of products not only places the public's health at risk but [also] erodes the trust consumers have in the products they purchase."  *Id.*

8.      As a result, Family Dollar had abundant notice and knowledge that it was unlawfully storing OTC drugs and medical devices in extreme temperatures that

---

[17] *See* Class Action Settlement Agreement and Release, Dkt. #181, Ex. 1.

[18] *Id.* at 13.

[19] *See* Office of Pub. Affairs, Dep't of Justice, *Family Dollar Stores LLC Pleads Guilty to Holding Consumer Products under Insanitary Conditions, Agrees to Pay $41.675 Million in Connection with Rodent-Infested Warehouse*, Feb. 26, 2024, https://www.justice.gov/opa/pr/family-dollar-stores-llc-pleads-guilty-holding-consumer-products-under-insanitary-conditions.

were outside of labeled temperature requirements.[20] The Inspection Report specifically warned Family Dollar that "**[d]rug products are not stored under appropriate conditions of temperature and humidity so that their identity, strength, quality, and purity are not affected**."[21]  The Inspection Report further stated that: "**your firm does not monitor nor control temperature or humidity within your warehouse.**  Your Facility Manager stated he has seen temperatures that can be as high as [redacted] °F in the upper parts of the Distribution Center using [redacted]. He stated he does not document when he checks temperatures, and your firm has no written procedure regarding this practice."[22]

9.     Despite the scrutiny and the warnings from the FDA, Family Dollar's failures to control temperatures in its facilities has continued unabated.  Since at least May 1, 2022, Family Dollar has knowingly and routinely sold adulterated products that were unsafe for human use or ingestion because they were sold outside of labeled temperature requirements.[23] The distribution and sale of these Adulterated

---

[20] *See* Inspection Report at 19-20.

[21] *Id.* at 19 (emphasis added).

[22] *Id.* at 20 (emphasis added).

[23]  Kate Gibson, *Family Dollar recalls more than 400 products that were improperly stored*, CBS News, July 22, 2022, https://www.cbsnews.com/news/family-dollar-recall-fda-improperly-stored-products-rodents/;    Aaron    Kassraie, *Family Dollar Recalls More Health Products*, AARP, Sept. 20, 2022, https://www.aarp.org/health/conditions-treatments/info-2022/family-dollar-health-products-recall.html; Elizabeth Napolitano, *Family Dollar recalls Advil kept "outside of labeled temperature requirements"*, CBS News, May 5, 2023, https://www.cbsnews.com/news/family-dollar-recalls-advil-ibuprofen/;        Lauren

Products to millions of unsuspecting consumers covers all states in the contiguous United States.

10.     This failure to safely store its products is highlighted by *five* separate recalls, where Family Dollar repeatedly claimed that the Adulterated Products were "inadvertently" shipping and sold.  But Family Dollar cannot realistically claim its shipments were "inadvertently" shipped when the storage conditions have not changed, and Family Dollar makes these illegal shipments over and over again.

11.     Family Dollar admitted that its products were "stored and shipped . . . outside of labeled temperature requirements," on the following occasions:

- Between May 1, 2022, and July 21, 2022, Family Dollar sold 434 adulterated and unsafe FDA-regulated drugs and medical devices in thousands of its stores in 47 states.[24]

- Between May 1, 2022, and August 5, 2022, Family Dollar sold 41 additional adulterated and unsafe FDA-regulated drugs and medical devices in 41 states.[25]

---

McCarthy, *Family Dollar Recalls Hundreds of Products Sold in 23 States*, The New York Times, Oct. 14, 2023, https://www.nytimes.com/2023/10/14/business/family-dollar-recall.html.

[24] Company Announcement, *Voluntary Recall of Certain Over-the-Counter Products*, FDA, July 21, 2022, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-products (attached as **Exhibit D**).

[25] Company Announcement, *Voluntary Recall of Certain Over-the-Counter Products Sold at Family Dollar Stores Because They Were Stored Outside of Temperature Requirements*, FDA, Sept. 16, 2022, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-

- 8 -

- • Between May 1, 2022, and September 15, 2022, Family Dollar sold six adulterated and unsafe FDA-regulated drugs in 11 states.[26]

- • Between June 1, 2022, and May 4, 2023, Family Dollar sold seven adulterated and unsafe FDA-regulated drugs in an undisclosed number of states.[27]

- • Between June 1, 2023, and October 5, 2023, Family Dollar sold 291 adulterated and unsafe FDA-regulated drugs and medical devices in 23 states.[28]

12.    Counsels' own investigation has confirmed and corroborated that the Adulterated Products problem is widespread and not limited to the recalled products. According to more than a half dozen former employees who worked at Family Dollar

---

recall-certain-over-counter-products-sold-family-dollar-stores-because-they-were-stored (attached as **Exhibit E**).

[26] Company Announcement, *Voluntary Recall of Certain Colgate Products Sold at Family Dollar Stores Because They Were Stored Outside of Temperature Requirements*, FDA, Sept. 16, 2022, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-colgate-products-sold-family-dollar-stores-because-they-were-stored-outside (attached as **Exhibit F**).

[27] Company Announcement, *Family Dollar is Initiating a Voluntary Recall of Certain Over-the-Counter Drug Products Because the Products Have Been Stored Outside of Labeled Temperature Requirements*, FDA, May 4, 2023, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/family-dollar-initiating-voluntary-recall-certain-over-counter-drug-products-because-products-have (attached as **Exhibit G**).

[28] Company Announcement, *Voluntary Recall of Certain Over-the-Counter Drugs and Medical Devices*, FDA, Oct. 10, 2023, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-drugs-and-medical-devices (attached as **Exhibit H**).

during the Class Period (May 2022 to the present), the distribution trucks were never temperature-controlled; employees never received training on proper storage of OTC medications and medical devices; and the stores themselves would be excessively hot during the summer (melting the chocolate in the store), and excessively cold during the winter.  These accounts came from District Managers, Store Managers, and Inventory Control Specialists, at stores across the United States.

13.    According to the FDA, storing these Products outside of required temperature ranges decreases the life expectancy of these drugs, medical devices, and medications. The FDA requires expiration dates on OTC drugs, and once they are stored improperly, a consumer can no longer rely on the expiration date. As the FDA explains, "[e]xpired medical products can be less effective or risky due to a change in chemical composition or a decrease in strength. Certain expired medications are at risk of bacterial growth and sub-potent antibiotics can fail to treat infections, leading to more serious illnesses and antibiotic resistance. Once the expiration date has passed there is no guarantee that the medicine will be safe and effective. If your medicine has expired, do not use it."[29]

14.    The recall notices say that customers who have purchased affected products "may return such product to the Family Dollar store where they were

---

[29] FDA, *Don't Be Tempted to Use Expired Medicines*, Feb. 2, 2021, https://www.fda.gov/drugs/special-features/dont-be-tempted-use-expired-medicines.

- 10 -

purchased without receipt."  But the recall does *not* say that customers will receive a full refund (as opposed to an exchange for a product that is also adulterated).  It is also illusory in that the products themselves may have been consumed, or at least not stored in their initial packaging.  Family Dollar initiates these "voluntary" recalls (following FDA's scrutiny of its storage facilities) because it knows that the cost is *de minimis* compared to the profits earned from the willful sale of adulterated products.

15.     To avoid losing millions of dollars in initial purchasing costs if it had properly quarantined, destroyed, and written off the Adulterated Products, Family Dollar repeatedly pushed these losses off on unsuspecting low- and fixed-income consumers. Family Dollar knowingly allowed these Adulterated Products to be distributed and sold to avoid massive losses and maximize profits.

16.     Under these circumstances, Family Dollar should not have sold any of the Adulterated Products during the Class Period. Further, based on Family Dollar's business practices, there is a cognizable danger of recurrent violations, and it is likely that Family Dollar is currently distributing and selling, and will continue distributing and selling, adulterated products that are stored in extreme temperatures outside of labeled temperature requirements.

17.     As a result, Family Dollar knowingly and willfully mislead, deceived, and omitted material information from Plaintiffs and similarly situated consumers.

Plaintiffs purchased the Products based on the reasonable belief that they were not adulterated, were safe for human use or ingestion, and met requirements as to safety, identity, strength, quality, purity, and effectiveness. Family Dollar did not disclose at the point of sale that the Adulterated Products were unfit for human consumption.

18.     As a proximate cause of Family Dollar's unlawful and unconscionable conduct, Plaintiffs and all other similarly situated consumers collectively suffered an injury-in-fact and economic damages when they purchased Products that were worthless or worth substantially less than what they paid.

19.     Accordingly, Plaintiffs bring claims related to the distribution and sale of the Adulterated Products under state laws for economic damages and equitable relief based on Family Dollar's unlawful, unfair, and deceptive business practice. Plaintiffs seek damages and equitable relief, including compensatory, statutory, and punitive damages; injunctive relief; attorneys' fees and costs; and all other available remedies and damages as allowed by applicable law.

## II.     THE PARTIES

### A.     Plaintiffs

20.     Below is a chart summarizing all Plaintiffs in this action:

| Plaintiff | State of purchase |
| --- | --- |
| Dana Berkley | NY |
| Nina Pallman | NY |
| Etoya Garrett | TX |

- 12 -

| Shakia Means | TX |
|---|---|
| Farah Sanders | TX |
| Margarite Sampson | LA |
| Casandra Maynard | LA |
| Alecia Bowens | TN |
| Terrance Montgomery | TN |
| Sandy Selesky | IL |

**1.    New York Plaintiffs**

**a.    Dana Berkley**

21.    Plaintiff Dana Berkley is, and at all times relevant hereto has been, a resident of Schenectady, New York.  During the Class Period, Ms. Berkley purchased various Adulterated Products, including but not limited to the following products, from Family Dollar Store #11668 in Schenectady, New York:[30]

> a)    Aveeno Baby Daily Moisture Lotion
>
> b)    Baby Love Vitamin A&D Ointment
>
> c)    Zarbees Ntrl Chld Cough Mucus
>
> d)    Arm and Hammer Ultra Max Invisible Solid Fresh Scent
>
> e)    Dove Mens Antiperspirant Invisible Solid Extra Fresh
>
> f)    Mennen Speed Stick Anti-Perspirant Invisible Solid Fresh

---

[30] The Adulterated Products listed herein are adopted verbatim from Family Dollar's lists of recalled products.

- 13 -

g)   Secret Rose Clear Gel Antiperspirant

h)   Aleve Arthritis Gelcaps

i)   Aleve Back & Muscle Pain

j)   Aleve Liquid Gel

k)   Benadryl Allergy

l)   Best Health Cough Drops

m)   Dayquil Kids Honey

n)   Good Sense Ibuprofen

o)   Hylands Cold N Cough Kids

p)   Motrin Ibuprofen

q)   Mucinex Fastmax Cold & Flu

r)   Mylicon Indant Gas Drops

s)   Orajel Gel

t)   Quality Plus Allergy

u)   Quality Plus Sinus Congestion

v)   Swan Medicated Chest Rub

w)   Tylenol Child

x)   Tylenol Extra Strength Caplet

y)   Vicks Vapostick

z)   Dawn Antibacterial Dish Soap

aa)   Dawn Ultra Apple Dishwashing Liquid

011231-12/2448713 V1

bb)     Softsoap Antibacterial Liquid Hand Soap

cc)     Always Fem Wipes Fresh And Clean

dd)     Dr. Teals Pure Epsom Salt

ee)     Purell Hand Sanitizer

ff)     Suave Hand Sanitizer Lotion

gg)     Aveeno Daily Moisturizing Lotion

hh)     Blistex Lip Balm

ii)     Carmex

jj)     Vaseline Lt Cocoa Butter Stick

kk)     Banana Boat Sport

ll)     Suntone Kids Sunscreen Lotion SPF50

mm)    Arm & Hammer Toothpaste

nn)     Crest Kids Toothpaste

oo)     Listerine Mouthwash Orig Amber

**b.    Nina Pallman**

22.    Plaintiff Nina Pallman is, and at all times relevant hereto has been, a
resident of Corman, New York.  During the Class Period, Ms. Pallman purchased
various Adulterated Products, including but not limited to the following products, at
Store #4408 in Coram, New York:

a)     Degree Female Invisible Solid Twin Powder 2.6 Ounces 2 Pack

b)     Secret Invisible Deodorant Shower Fresh 2.1 OZ

- 15 -

    c)      Suave Invisible Deodorant Solid Powder 1.2 OZ

    d)      Advil Liquid Gel Caplet 40 Count

    e)      Good Sense Ibuprofen Caplet 100 Count

    f)      Good Sense Ibuprofen Tablet 100 Count

    g)      Good Sense Pain Reliever Acetaminophen 500 MG 250 Caplets

    h)      Good Sense Esomeprazole Acid Reducer 20 MG 42 Count

    i)      Nyquil Original Cold And Flu Liquid 12 Fluid Ounces

    j)      Dawn Antibacterial Dish Soap Apple Blossom 6.5 FL OZ

    k)      Crest and Colgate toothpaste

**2.**    **Texas Plaintiffs**

    **a.**    **Etoya Garrett**

23.    Plaintiff Etoya Garrett is, and at all times relevant hereto has been, a resident of San Antonio, Texas.  During the Class Period, Ms. Garrett purchased various Adulterated Products, including but not limited to the following products, from Store #11477 and Store #8903 in San Antonio, Texas:

    a)      Claritin Allergy 10 Milligrams Tablet 10 Count

    b)      Benadryl Allergy Liquid Gels 24 Count

    c)      Colgate Charcoal Toothpaste 2.2 OZ

    d)      Excedrin Migraine Caplet 24 Count

    e)      Clear Eye Max Redness Relief .5 FL OZ

> f)     Motrin Ibuprofen 24 Caplets
>
> g)     Nyquil Cherry Cold And Flu Liquid 12fl Oz
>
> h)     Colgate Total Whitening Toothpaste 4.8Oz
>
> i)     Tylenol Extra Strength Caplet 24 Ct

**b.**    **Shakia Means**

24.    Plaintiff Shakia Means is, and at all times relevant hereto has been, a resident of San Antonio, Texas.  During the Class Period, Ms. Means has purchased various Adulterated Products, including but not limited to the following products, from Store #2331 in San Antonio, Texas:

> a)     Tylenol Child Grape Syrup 4 FL OZ
>
> b)     Benadryl Child Allergy Chwbl Grape 20CT
>
> c)     Degree Womans Sexy Intrigue 2.6 Ounces
>
> d)     Suave Anti-Perspirant Invisible Solid Tropical Paradise 2.6 Ounces

**c.**    **Farah Sanders**

24.    Plaintiff Farah Sanders is, and all relevant times has been, a resident of Chester, Texas.   During the Class Period, Ms. Sanders has purchased various Adulterated Products, including but not limited to the follow product, from Store #10646 in Colmesneil, Texas:

> a)     Crest Pro Hlth Adv Gum Protctn 5.1OZ.

3.      **Louisiana Plaintiffs**

a.      **Margarite Sampson**

25.    Plaintiff Margarite Sampson is, and at all times relevant hereto has been, a resident of Bonita, Louisiana.   During the Class Period, Ms. Sampson purchased various Adulterated Products, including but not limited to the following products, from Store #917 in Bastrop, Louisiana:

a)      A H Peroxicare Mint Paste 6oz

b)      Benadryl Child Allergy Chwbl Grape 20ct

c)      Vicks Sinex Severe Nasal Spray .5fl Oz

d)      New Skin Liquid Bandage Clear .3fl Oz

e)      Vaseline Lt Cocoa Butter Stick 0.16oz

f)      Always Fem Wipes Fresh And Clean 32ct

g)      Tylenol Extra Strength Caplets 6ct

h)      Pepto Bismol Ultra Caplets 12ct

i)      Aleve Pm Caplets 20ct

j)      Motrin Infant Drops Berry .5fl Oz

k)      Monistat 7 Cream 1.59 Fl Oz

l)      Clr Eys Mx Rdns Rlif .5fl Oz

m)      One A Day Womens Vitacraves 40ct

- 18 -

### b. Casandra Maynard

26.    Plaintiff Casandra Maynard is, and at all times relevant hereto has been, a resident of Deridder, Louisiana.  During the Class Period, Ms. Maynard purchased various Adulterated Products, including but not limited to the following products, from Store #11068 in Deridder, Louisiana:

     a)    Colgate Optic White Stain Prevention Toothpaste 2.1 OZ

     b)    Blistex Lip Balm .15OZ

     c)    New Skin Liquid Bandage Clear .3FL OZ

     d)    Arm and Hammer Ultra Max Invisible Solid Fresh Scent 1 Ounce

### 4. Tennessee Plaintiffs

### a. Alecia Bowens

27.    Plaintiff Alecia Bowens is, and at all times relevant hereto has been, a resident of Memphis, Tennessee.  During the Class Period, Ms. Bowens purchased various Adulterated Products, including but not limited to the following products, from Store #3370 in Memphis, Tennessee:

     a)    Voltaren Arthritis Pain Relief Gel 20G

     b)    Midol Complete 16 Caplets

     c)    Medic Eye Drops Max Redness

     d)    BC Powder On-the-Go Stick Packs 50 Count

     e)    Claritin Allergy 10 Milligrams Tablet 10 Count

f)      Colgate Max Fresh Cool Mint Toothpaste 6 OZ

g)      Icy Hot Patch 1 Count

h)      Dulcolax 5 MG 25 Tablets

i)      Dr. Scholls Anti-Fungal Spray Powder 4.7 OZ

j)      Lady Speed Stick Anti-Perspirant Deodorant Wild Freesia 1.4 OZ

k)      Ready In Case 70 Percent Isopropyl Alcohol 16 FL OZ

l)      Benadryl Extra Strength Cream 1 Ounce

**b.      Terrance Montgomery**

28.     Plaintiff Terrance Montgomery is, and at all times relevant hereto has been, a resident of Memphis, Tennessee.  During the Class Period, Mr. Montgomery purchased various Adulterated Products, including but not limited to the following products, from Store #7230 in Memphis, Tennessee:

a)      Swan Mouthwash Green Mint 1 LTR

b)      Colgate Cavity Protection 6 OZ

**5.      Illinois Plaintiff**

**a.      Sandy Selesky**

29.     Plaintiff Sandy Selesky is, and at all times relevant hereto has been, a resident of Stockton, Illinois.  During the Class Period, Ms. Selesky purchased various Adulterated Products, including but not limited to the following products, from Store #10590 in Stockton, Illinois:

a)      Advil 200MG Tablets 100CT

b)      Secret Power Fresh Invisible Solid Deodorant 1.7 OZ

**B.   Defendants**

30.     Defendant Family Dollar Stores, Inc. is incorporated in Delaware and has its principal place of business located at 500 Volvo Pkwy, Chesapeake, Virginia 23320.

31.     Defendant Dollar Tree, Inc. is incorporated in Virginia and has its principal place of business located at 500 Volvo Pkwy., Chesapeake, Virginia 23320. Defendant Dollar Tree, Inc. is the parent company and owner of Family Dollar Stores, Inc. and its wholly-owned subsidiaries.

32.     Defendant Dollar Tree Stores, Inc. is incorporated in Virginia and has its principal place of business located at 500 Volvo Pkwy., Chesapeake, Virginia 23320. Defendant Dollar Tree Stores, Inc. and Dollar Tree, Inc. share the same principals.

33.     Defendant Family Dollar, LLC is incorporated in Virginia and has its principal place of business located at 500 Volvo Pkwy., Chesapeake, Virginia.

34.     Defendants Family Dollar Stores, Inc.; Dollar Tree, Inc.; Dollar Tree Stores, Inc., and Family Dollar, LLC share principals, including but not limited to, Chief Executive Officer, Chief Strategy Officer, Chief Information Officer, Chief

Merchandising Officer, Chief Operating Officer, Chief Legal Officer, and Senior Vice President.

35.     Defendant Family Dollar Inc. is incorporated in North Carolina and has its principal place of business located at 500 Volvo Pkwy., Chesapeake, Virginia 23320.

36.     Defendants are responsible for the unlawful storage, distribution, marketing, and selling of the Adulterated Products to consumers throughout the United States. Defendants created, negligently oversaw, and/or authorized the unlawful, unfair, grossly negligent, and/or deceptive storage, distribution, marketing, and selling of the Products.

### III.   JURISDICTION & VENUE

37.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332, for the following reasons: (a) some of the Class members are citizens of a state that is different from the citizenship of the Defendants; (b) the putative class size is greater than 100 persons; (c) the amount in controversy in the aggregate for the putative class exceeds the sum of $5 million, exclusive of interest and costs; and (d) the primary Defendants do not include States, State officials, and/or other governmental entities against whom the Court may be foreclosed from ordering relief.

011231-12/2448713 V1

38.     This Court has personal jurisdiction over Defendants because they are authorized to conduct and do business in New York. Defendants are engaged in the storage, distribution, marketing, and selling of OTC drugs and medical devices to Plaintiffs in New York and in this District. Defendants have over 300 Family Dollar retail stores and at least one distribution center in New York, including in Rome, New York, which is a 907,000-square-foot facility that, in addition to New York, "services stores in Arkansas, Louisiana, Texas, Oklahoma, Missouri, Illinois, Kentucky, Tennessee, Georgia, Alabama, and Mississippi."[31] Defendants have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their storage, distribution, marketing, and selling of millions of dollars of products within the State to render exercise of jurisdiction by this Court permissible.

39.     Venue is proper in this Court under 28 U.S.C. §§ 1391(a) and (b)(2) and 28 U.S.C. § 1391(d) because Defendants regularly conduct substantial business within this District.

40.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District, namely Defendants' unlawful storage, distribution, marketing, and selling of the Adulterated Products occurred in this District, and

---

[31] *See* https://www.familydollar.com/locations/ny/rome/dc208/.

Defendants caused financial harm to members of the putative class that reside in this District.

## IV.   FACTUAL ALLEGATIONS

### A.   FDA regulations

41.   The production, sale, and distribution of drugs[32] and medical devices[33] are regulated by the FDA, pursuant to authority granted by the Federal Food, Drug, and Cosmetic Act ("FDCA").[34]

42.   Congress intended the FDCA to "safeguard" and "protect" consumers from "dangerous products" affecting public health and safety by regulating products from the "moment of their introduction into interstate commerce all the way to the

---

[32] The FDCA generally defines the term "drug" as "(A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C)."21 U.S.C. § 321(g)(1).

[33] The FDCA generally defines the term "device" as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is— (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them, (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or (3) intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes." *Id.* § 321(h)(1).

[34] 21 U.S.C. § 301 *et seq*.

- 24 -

moment of their delivery to the ultimate consumer."[35] Under the FDCA, and parallel state laws, it is illegal to adulterate a drug or medical device or to introduce into interstate commerce a drug or medical device that is adulterated.

43.   A drug is deemed adulterated if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or *holding* do not conform to or are not operated or administered in conformity with current good manufacturing practice [('cGMP')]."[36]

44.   A medical device is also deemed adulterated if it does not conform to or is not operated or administered in conformity with cGMP.[37]

45.   The cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess."[38]

46.   Any drug not manufactured in accordance with cGMPs is deemed "adulterated and/or misbranded" and may not be distributed or sold in the United

---

[35] *United States v. Sullivan*, 332 U.S. 689, 696 (1948).

[36] 21 U.S.C. § 351(a)(2)(B) (emphasis added).

[37] 21 C.F.R. § 820 *et seq.*

[38] 21 C.F.R. § 210.1(a).

States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

47.     Among the ways a drug may be adulterated and/or misbranded are:

a.      "if it has been prepared, packed, or held under unsanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health";[39] [or]

b.      "if . . . the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice . . . as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]"[40]

48.     Per federal law, cGMPs include "the implementation of oversight and controls over the manufacture of drugs to ensure quality, including managing the risk of and establishing the safety of raw materials, materials used in the manufacturing of drugs, and finished drug products." 21 U.S.C. § 351(j).

49.     FDA regulations require a "quality control unit" to independently test drug product manufactured by another company on contract:

> There shall be a quality control unit that shall have the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated. The quality control unit shall be responsible for approving or rejecting drug

---

[39] 21 U.S.C. § 351(a)(2)(A).

[40] 21 U.S.C. § 351(a)(2)(B).

- 26 -

> products manufactured, processed, packed, or held under
> contract by another company.

21 C.F.R. § 211.22(a).

50.     Indeed, FDA regulations require a drug manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

51.     As detailed below, Family Dollar's failure to comply with the FDCA's clear mandates made it unlawful to introduce the Adulterated Products into interstate commerce and sell them to Plaintiffs and similarly situated consumers, as the Products were adulterated, unsafe for human use or ingestion, and defective.

52.     Family Dollar is responsible for ensuring that it complies with all applicable laws and FDA regulations regarding the storage, distribution, marketing, and sale of regulated products.

53.     Plaintiffs reference federal law in this Complaint not in any attempt to enforce it, but to demonstrate that their state-law tort claims do not impose any additional obligations on Defendants, beyond what is already required of them under federal law.

**B.**     **Background on Family Dollar and Dollar Tree**

54.     In 2015, Dollar Tree acquired Family Dollar for $8.5 billion.[41] The two companies merged, but as a result of cost-cutting programs, years of mismanagement, and dysfunction, Family Dollar has become Dollar Tree's "problem child."[42] Consequently, remediating logistical, storage, distribution, and other significant operational difficulties have not been adequately funded or implemented.[43]

55.     Although Defendants may claim that customers can return the Adulterated Products, Family Dollar's refund policy is limited, only allowing for three returns within a 30-day period. The policy reads as follows: "With original receipt, items will be exchanged for other merchandise item(s) or a refund will be issued in the original form of payment. Without original receipt, customers may return up to three items within a 30-day period. Items will be exchanged or refunded at the lowest advertised price. Refunds will be issued as a Family Dollar merchandise return card."[44]

---

[41] Hadley Malcolm, *Dollar Tree buying Family Dollar for $8.5 billion*, USA Today, July 28, 2014, https://www.usatoday.com/story/money/business/2014/07/28/dollar-tree-buys-family-dollar/13258861/.

[42] Nathan Bomey, *Family Dollar struggles with "problem child" woes*, Axios, July 22, 2022, https://www.axios.com/2022/07/22/family-dollar-recall-dollar-tree.

[43] *Id.*

[44] https://www.familydollar.com/return-policy

**C.     FDA warns Family Dollar about its putrid storage conditions.**

56.     In late January 2022, following a news report on the rat infestation at

the West Memphis (Arkansas) Distribution Center, the FDA initiated a series of

inspections and issued an Inspection Report detailing the deplorable conditions it

observed at the Distribution Center.[45]

57.     On February 18, 2022, the FDA alerted the public to potentially

contaminated products, including OTC drugs and medical devices, and announced

that it had found unsanitary and dysfunctional conditions that "appear to be

violations of federal law" at Family Dollar's West Memphis Distribution Facility.[46]

58.     According to the FDA Safety Alert, which was based on the Inspection

Report's findings:

> Today, the U.S. Food and Drug Administration is alerting
> the public that several categories of FDA-regulated
> products purchased from Jan. 1, 2021, through the present
> from Family Dollar stores in Alabama, Arkansas,
> Louisiana, Mississippi, Missouri, and Tennessee may be
> unsafe for consumers to use. The impacted products
> originated from the company's distribution facility in
> West Memphis, Arkansas, where an FDA inspection
> found insanitary conditions, including a rodent infestation,
> that could cause many of the products to become
> contaminated. The FDA is working with the company to
> initiate a voluntary recall of the affected products.
>
> **"Families rely on stores like Family Dollar for products
> such as food and medicine**. **They deserve products that**

---

[45] *See* Inspection Report, Ex. A.
[46] FDA Safety Alert, Ex. B, at 1.

- 29 -

**are safe**," said Associate Commissioner for Regulatory Affairs Judith McMeekin, Pharm.D. "No one should be subjected to products stored in the kind of unacceptable conditions that we found in this Family Dollar distribution facility. These conditions appear to be violations of federal law that could put families' health at risk. We will continue to work to protect consumers."

This alert covers FDA-regulated products purchased from Family Dollar stores in those six states from Jan. 1, 2021, through the present. Some examples of these products include human foods (including dietary supplements (vitamin, herbal and mineral supplements)), cosmetics (skincare products, baby oils, lipsticks, shampoos, baby wipes), animal foods (kibble, pet treats, wild bird seed), **medical devices (feminine hygiene products, surgical masks, contact lens cleaning solutions, bandages, nasal care products) and over-the-counter (OTC) medications (pain medications, eye drops, dental products, antacids, other medications for both adults and children**).

Consumers are advised not to use and to contact the company regarding impacted products. The agency is also advising that all drugs, medical devices, cosmetics and dietary supplements, regardless of packaging, be discarded. Food in non-permeable packaging (such as undamaged glass or all-metal cans) may be suitable for use if thoroughly cleaned and sanitized. Consumers should wash their hands immediately after handling any products from the affected Family Dollar stores.

Consumers who recently purchased affected products should contact a health care professional immediately if they have health concerns after using or handling impacted products. Rodent contamination may cause Salmonella and infectious diseases, which may pose the greatest risk to infants, children, pregnant women, the elderly and immunocompromised people.

Following a consumer complaint, the FDA began an investigation of the Family Dollar distribution facility in West Memphis, Arkansas, in January 2022. Family Dollar ceased distribution of products within days of the FDA inspection team's arrival on-site and the inspection concluded on Feb. 11. Conditions observed during the inspection included live rodents, dead rodents in various states of decay, rodent feces and urine, evidence of gnawing, nesting and rodent odors throughout the facility, dead birds and bird droppings, and products stored in conditions that did not protect against contamination. More than 1,100 dead rodents were recovered from the facility following a fumigation at the facility in January 2022. Additionally, a review of the company's internal records also indicated the collection of more than 2,300 rodents between Mar. 29 and Sep. 17, 2021, demonstrating a history of infestation.[47]

59.    At that time, Family Dollar initiated a recall[48] and temporarily closed 404 stores in six states to remove all remaining contaminated products.[49]

60.    Importantly, the Inspection Report specifically warned Family Dollar that "**[d]rug products are not stored under appropriate conditions of temperature and humidity so that their identity, strength, quality, and purity are not affected**."[50]

61.    The Inspection Report further stated that:

Specifically, **your firm does not monitor nor control temperature or humidity within your warehouse**. Your

---

[47] *Id*. at 1-2 (emphasis added).

[48] *See* Company Announcement, Ex. C.

[49] Tabahriti, *supra* note 15

[50] Inspection Report, Ex. A at 19.

- 31 -

firm stores drug products on various levels within the warehouse where temperatures can exceed [redacted] °F at the floor level during the summer months and reach higher temperatures in the upper levels of the warehouse.

Your Facility Manager stated he has seen temperatures that can be as high as [redacted] °F in the upper parts of the Distribution Center using [redacted]. He stated he does not document when he checks temperatures, and **your firm has no written procedure regarding this practice**.

We observed several drug products that were labeled with storage temperatures of 20-25°C (68-77°F) with some stating to "protect from moisture", "avoid high humidity" and/or "avoid excessive heat". These products include Extra Strength Tylenol Rapid Release Gelcaps, Family Wellness brand Maximum Strength Cold & Flu softgels, and Good Sense brand Omeprazole Delayed Release Tablets 20mg.[51]

62.    Based on the February 2022 Inspection Report, Family Dollar had irrefutable notice and knowledge that it was violating FDA regulations and placing the safety and health of its consumers at risk by storing these Products at extreme temperatures outside of labeled temperature and humidity requirements.

63.    The squalid conditions prompted a criminal investigation by the U.S. Attorney's Office in the Eastern District of Arkansas.[52] Family Dollar disclosed that the grand jury subpoena requested information related to "pests, sanitation and

---

[51] *Id.* at 20 (emphasis added).
[52]    Stapleton,    https://www.cnbc.com/2022/03/15/dollar-tree-discloses-federal-grand-jury-subpoena-over-pest-issue-.html.

compliance with law regarding certain of our procedures and products."[53]   On February 26, 2024, Family Dollar Stores LLC pled guilty to one count of causing FDA-regulated products to become adulterated while being held under unsanitary conditions.  Pursuant to the plea agreement, Family Dollar agreed to pay a fine and forfeiture totaling over $41.6 million.  According to the U.S. Department of Justice, this is "the largest-ever monetary criminal penalty in a food safety case."[54]  As part of the plea agreement, Family Dollar admitted that "no later than January 2021, some Company employees were aware that the sanitation conditions at [the West Memphis distribution facility, "DC202"] were such that FDA-regulated products became adulterated and were shipped to Family Dollar stores.  Despite this, however, [Family Dollar] did not take adequate steps to prevent adulteration of FDA-regulated product while it was being held for sale at DC202 or to cease shipping adulterated FDA-regulated products from DC202 in interstate commerce."[55]

---

[53] Dollar Tree 10-K Annual Report, at 20, https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000935703/000093570322000020/dltr-20220129.htm.

[54] *See* Office of Pub. Affairs, Dep't of Justice, *Family Dollar Stores LLC Pleads Guilty to Holding Consumer Products under Insanitary Conditions, Agrees to Pay $41.675 Million in Connection with Rodent-Infested Warehouse*, Feb. 26, 2024, https://www.justice.gov/opa/pr/family-dollar-stores-llc-pleads-guilty-holding-consumer-products-under-insanitary-conditions.

[55] *See* Plea Agreement at 9-10, *United States v. Family Dollar Stores, LLC*, No. 24-cr-00001 (E.D. Ark. Feb. 26, 2024), ECF No. 19.

011231-12/2448713 V1

64.     The events also gave rise to a multidistrict litigation proceeding in Tennessee,[56] which resulted in a settlement for Family Dollar consumers in six states who purchased contaminated products between January 2021 and February 2022.[57]

65.     On November 8, 2022, the FDA also sent a "Warning Letter"[58] to then-CEO of Dollar Tree, Michael Witynski, regarding conditions observed during the February 2022 inspections.[59]

66.     The Warning Letter once again warned Family Dollar that "[y]our firm should investigate and determine the causes of any violations and take prompt actions to correct any violations and bring the products into compliance. It is your responsibility to ensure that your firm complies with all requirements of federal law, including FDA regulations."[60]

---

[56] *See In re: Family Dollar Stores, Inc. Pest Infestation Litig.*, 22-md-03032 (W.D. Tenn.); *see also* Consolidated Class Action Complaint, Ex. E.

[57] *See* Class Action Settlement Agreement and Release, Dkt. #181, Ex. 1.

[58] The FDA issues warning letters to alert individuals or firms that the agency has identified "violations of regulatory significance" and to request corrective action, with the expectation that most recipients will voluntarily come into compliance with the law. *See* FDA Regulatory Procedures Manual § 4-1-1 (June 2022), available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-manuals/regulatory-procedures-manual.

[59] Edmundo Garcia, *WARNING LETTER*, FDA, Nov. 8, 2022, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/dollar-tree-inc-629509-11082022 (attached as **Exhibit I**).

[60] *Id.* at 8.

- 34 -

67.     Yet, even after the release of the Inspection Report and Warning Letter, the eventual departure of its senior management team, including its CEO, and a federal grand jury investigation, Family Dollar continues its unlawful, unfair, and deceptive business practices by introducing into interstate commerce and selling Adulterated Products that are stored in extreme conditions, outside of labeled temperature requirements, to millions of unsuspecting consumers throughout the country.

**D.      Family Dollar routinely and unlawfully sells adulterated drugs and medical devices.**

**1.      Adulterated sales between May 1, 2022, and July 21, 2022**

68.     Between May 1, 2022, and July 21, 2022, Family Dollar unlawfully introduced into interstate commerce and sold 434 self-described adulterated and unsafe FDA-regulated drugs and medical devices to unsuspecting consumers in thousands of its stores in 47 states that Family Dollar disclosed "were stored and inadvertently shipped . . . outside of labeled temperature requirements."[61]

69.     Adulterated Products included, among many others, Tylenol, Advil, Benadryl, Aleve, Claritin, Bayer, Pepcid, Orajel, Motrin, Afrin, Miralax, Imodium, Excedrin, Pepto Bismol, Milk of Magnesia, Alka Seltzer, Swan, Natureplex, Guardian, Dr. Scholls, Vicks, Purell, Cortizone, Robitussin, Systane, DayQuil and

---

[61] Company Announcement, Ex. D, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-products.

NyQuil; sleep-aid, anti-diarrhea, and laxative medications; eye ointments and drops; oral care products; and children's medications, such as Tylenol Infant Drops, Zarbees Natural Baby Cough and Mucus Relief Syrup, Zyrtec Children's Grape, Hyland's for Kids Cold & Mucus Relief, and Children's Mortin Bubblegum Syrup.[62]

### 2. Adulterated sales between May 1, 2022, and August 5, 2022

70.    Between May 1, 2022, and August 5, 2022, Family Dollar unlawfully introduced into interstate commerce and sold 41 self-described adulterated and unsafe FDA-regulated drugs and medical devices to unsuspecting consumers in thousands of it stores in 41 states that Family Dollar disclosed "were stored and inadvertently shipped . . . outside of labeled temperature requirements."[63]

71.    Adulterated Products included numerous name brand pregnancy tests, such as VeriQuick, First Response, and Clearblue; latex lubricated condoms, such as Trojan, Skyn, and LifeStyles; Preferred UTI test strips, Clear Eyes Contact Lens Drops; Fixodent and Poligrip denture adhesive creams; New Skin Liquid Bandage; Dentemp Onestep dental repair fillers, At Home marijuana drug test strips; and Curad First Aid Kits.[64]

---

[62] *Id.* at 4-14.

[63] Company Announcement, Ex. E, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-products-sold-family-dollar-stores-because-they-were-stored.

[64] *Id.*

### 3.    Adulterated sales between May 1, 2022, and September 15, 2022

72.    Between May 1, 2022, and September 15, 2022, Family Dollar unlawfully introduced into interstate commerce and sold six self-described adulterated and unsafe FDA-regulated drugs to unsuspecting consumers in thousands of its stores in 11 states that Family Dollar disclosed "were stored and shipped . . . outside of labeled temperature requirements."[65]

73.    Adulterated Products included an assortment of oral care products including toothpastes and mouthwashes.[66]

### 4.    Adulterated sales between June 1, 2022, and May 4, 2023

74.    Between June 1, 2022, and May 4, 2023, Family Dollar unlawfully introduced into commerce and sold seven self-described adulterated and unsafe FDA-regulated drugs to unsuspecting consumers in thousands of its stores in an undisclosed number of states that Family Dollar disclosed "were stored and shipped . . . outside of labeled temperature requirements."[67]

---

[65] Company Announcement, Ex. F, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-colgate-products-sold-family-dollar-stores-because-they-were-stored-outside.

[66] *Id.*

[67] Company Announcement, Ex. G, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/family-dollar-initiating-voluntary-recall-certain-over-counter-drug-products-because-products-have.

75.     Adulterated Products included an assortment of Advil tablets, caplets, dual action caplets, liquid gel, and liquid gel minis.[68]

**5.     Adulterated sales between June 1, 2023, and October 5, 2023**

76.     Between June 1, 2023, and October 5, 2023, Family Dollar unlawfully introduced into commerce and sold 291 self-described adulterated and unsafe FDA-regulated drugs and medical devices to unsuspecting consumers in thousands of its stores in 23 states[69] that Family Dollar disclosed "were stored outside of labeled temperature requirements . . . and inadvertently shipped to certain stores . . . ."[70]

77.     Adulterated Products included an assortment of Advil tablets, caplets, dual action caplets, liquid gel, and liquid gel minis.[71]

**6.     Plaintiffs' own investigation reveals Family Dollar knew OTC medications were stored outside of acceptable temperature ranges.**

78.     Plaintiffs' own investigation has confirmed not only that the inadequate storage conditions are endemic, but that Family Dollar's corporate officers were well aware of the problem because they monitored the temperature at their facilities. District Managers, Store Managers, and Inventory Specialists have all confirmed

---

[68] *Id.*

[69] AL, AR, AZ, CA, CO, FL, GA, ID, KS, LA, MS, MT, ND, NE, NM, NV, OK, OR, SD, TX, UT, WA, and WY.

[70] Company Announcement, Ex. H, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-drugs-and-medical-devices (emphasis added).

[71] *Id.* at 4-11.

- 38 -

that there are no temperature controls during transport, trucks would often sit at stores in hot or cold temperatures for 12-48 hours before being unloaded, employees receive no training on safe storage of OTC medications and medical devices, and the stores are excessively hot in the summer and excessively cold in the winter, ruining the food products and OTC medications alike.

79.     For example, a former store manager ("SM") who worked at Family Dollar through Fall 2022 told Plaintiffs' investigator that the delivery trucks were not temperature controlled.  SM has personal experience with this issue because SM's responsibilities included unloading the trucks.  From this experience, SM observed that the delivery trucks (which included all products, including OTC medications) would be sweltering in the summer months, with no cooling system or cooling fan.  The products were stored in black plastic totes, which in the summer were hot to the touch.  The totes themselves also contained no cooling mechanism.

80.     In addition, when air conditioning units broke at Family Dollar stores, the company allowed the stores to stay open for days even when the temperatures inside the stores rose to uncomfortable levels, including what SM estimated was 100-degree heat.  In the winter months, when the heating unit broke, the store would stay open, despite cold temperatures that compelled SM and SM's employees to work with their coats on.

- 39 -

81.     SM also stated that the employees or managers did not have the ability to set temperatures at their stores; they were set and controlled remotely by the corporate office.  SM confirmed that Family Dollar did not have a policy that required managers to pull any OTC medication or medical devices from the shelves in extremely hot or cold conditions, even though the employees would pull food products like chocolate from the shelves because they were melting in the heat.  SM was never told, formally or informally, about the need to store OTC medications and medical devices within certain prescribed temperature ranges.

82.     SM does not recall being informed about any recalls affecting SM's stores, even though there were at least *two* recalls on OTC medications and medical devices that covered SM's stores during SM's employment.  *See supra* § IV.D.(1)-(5).

83.     Another worker at the St. George, Utah, distribution center confirmed that, until recently, there was no temperature control system in the distribution center.  Temperatures at the distribution center exceeded 100 degrees in the summer.

84.     Yet another district manager in California and Nevada confirmed that his/her stores received products from the St. George, Utah, distribution center, and the semi-trailer trucks that delivered OTC medications were not temperature-controlled.  The products would sit in the trucks often for a day or more, in addition to the time spent in transport, and the temperature would reach triple digits in his/her

- 40 -

area.  The air conditioning would often fail during the summer, and "you'd have chocolate melting at the checkouts because it was so hot."  Family Dollar refused to close the stores in those situations.

85.    This account of the trucks not being temperature-controlled has been corroborated by others, including a former District Manager in the Southeast who worked at Family Dollar for decades.  In yet another example, a store manager from Ohio—who worked at a Family Dollar store for several years, through early 2023— stated that the delivery trucks were never temperature-controlled.  If the trucks came in after dark, they would sit until morning before being unloaded.  In the summer, the products were hot to the touch, and in the winter, many of the products would freeze.  In the store, the store manager stated that it was so hot the chocolates would melt.  In the winter, it was freezing inside the store and the employees could see their breath.  This store manager never received training regarding temperature control, including for medications.  In addition, the store manager contacted the health department multiple times about baby food and medicines being expired, and mold in the coolers. The health department visited the store and told the district manager to rectify the problems within 30 days.  The store would be cleaned up a couple of days right before an inspection, but the problems would persist after the inspection without any longer-term solution being implemented.

86.     Another store manager in the Southeast had to contend with a "roof rat"[72] infestation that lasted for *six months*.  Family Dollar delayed eradicating the rats because of a dispute about who should pay for it.  As a result, there were roof rats dying in the walls and ceilings, and the foul smell would become so strong that employees would open the front door to air out the store.  This manager could not comprehend why Family Dollar would allow an infestation of roof rats for six months in a store because of a payment dispute.

**E.     Family Dollar's ongoing unlawful conduct**

87.     Family Dollar had a duty and an obligation to properly (a) store the regulated Products at labeled temperature requirements; (b) inspect its facilities, including its warehouses and distribution centers, to ensure that effective control measures were being taken to prevent the improper storage and sale of the Products; (c) quarantine and destroy Adulterated Products; (d) prevent the Adulterated Products from being placed in the stream of commerce and sold; (e) warn consumers that the Products could not lawfully be sold, were adulterated, were unsafe for human use or ingestion, and did not meet requirements as to safety, identity, strength,

---

[72] "Roof rats are long and thin rodents that have large eyes and ears, a pointed nose and a scaly tail. . . . [They] can measure more than 40 cm [16 inches] long." *See* https://www.pestworld.org/pest-guide/rodents/roof-rats/ (last visited Mar. 8, 2024).

quality, purity, and effectiveness, and (f) fully advise customers of their rights to a refund.

88.     As detailed herein, Family Dollar had notice and knowledge that it was (a) not properly storing the Products at labeled temperature requirements; (b) not inspecting its warehouses and distribution centers to ensure effective control measures were being taken to prevent the improper storage and sale of the Products; (c) not quarantining and destroying Adulterated Products; (d) not preventing the Products from being placed in the stream of commerce and sold; (e) not warning consumers that the Products could not lawfully be sold, were adulterated, were unsafe for human use or ingestion, and did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness, and (f) not properly informing customers of their rights to a refund.

89.     Family Dollar willfully allowed, negligently oversaw, and/or authorized the unlawful business practices, and otherwise concealed material information from Plaintiffs and all other similarly situated consumers to avoid massive losses and to maximize profits.

90.     Instead, and in order to avoid losing millions of dollars in initial purchasing costs had it properly quarantined, destroyed, and written-off the Adulterated Products, Family Dollar repeatedly pushed these losses off on unsuspecting low- and fixed-income consumers. Family Dollar knowingly allowed

these Products to be distributed and sold and willfully turned a blind eye by failing to implementing practices and procedures to prevent these Products from being "inadvertently" shipped and sold.  Family Dollar would then "recall" the products that it deliberately sold, knowing full well that the refunds issued would be minimal.

91.     Plaintiffs and all other similarly situated consumers unknowingly absorbed Family Dollar's massive losses by purchasing Adulterated Products that could not lawfully be sold, were unsafe for human use or ingestion, and were defective as they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

92.     Family Dollar knowingly and willfully mislead, deceived, and omitted this material information from Plaintiffs and similarly situated consumers. Plaintiffs purchased the Products based on the reasonable belief that they were not adulterated, were reasonably safe for human use or ingestion, and met requirements as to safety, identity, strength, quality, purity, and effectiveness. Plaintiffs would not have purchased the Products had they known they were adulterated, unsafe for human use or ingestion, and defective.

93.     Through its misconduct, Family Dollar unlawfully reaped millions of dollars on the backs of unsuspecting low- and fixed-income consumers by knowingly introducing the Adulterated Products into the stream of commerce and selling them.

**F.     Injury to Plaintiffs and Class members from Family Dollar's unlawful conduct**

94.     Plaintiffs, and similarly situated consumers, each suffered an injury-in-fact when they purchased Products that could not legally be sold and had no economic or legal value.

95.     Plaintiffs did not receive the benefit of the bargain when they paid money to purchase what they believed were lawful, safe, and effective products, and in return, received unlawful and Adulterated Products that were worthless or worth substantially less than what they paid.

96.     Plaintiffs unknowingly purchased, used, and/or ingested Products that Congress judged insufficiently safe for human use or ingestion, and thus the Products were worthless and had no value.

97.     No reasonable consumer would expect Family Dollar to store these Products outside of labeled temperature requirements. Furthermore, no reasonable consumer would purchase Products that were stored outside of labeled temperature requirements or pay full retail value for these Products. At a bare minimum, a reasonable consumer would expect that Family Dollar stored these Products at labeled temperature requirements.

98.     Family Dollar's fraudulent omissions were material for inducing Plaintiffs to purchase the Products. But for Family Dollar's fraudulent omissions,

- 45 -

Plaintiffs would not have purchased the Products or would not have paid full retail value for them.

99.    Despite notice and knowledge, Family Dollar knowingly omitted material information regarding its unlawful business practices from all marketing, advertising, promotion, or other contacts with Plaintiffs, and all others similarly situated consumers, prior to and during each sale.

100.    Because Family Dollar knowingly failed to disclose material information and failed to correct or stop its unlawful business practices, Plaintiffs and all others similarly situated consumers purchased Products they would otherwise not have purchased, paid significantly less to purchase the Products, or purchased the Products elsewhere.

101.    Family Dollar's deceptive business practices and omissions induced Plaintiffs, and members of the public, to purchase the Products (or to purchase more of them) and/or to pay more for them.

102.    Each Plaintiff paid full retail price for these brand name Products. Under the circumstances, no sales of these Products should have ever taken place, and Plaintiffs did not receive the benefit of the bargain, have suffered an injury-in-fact, and have been damaged.

103.    Family Dollar's competitors, such as Walmart, Dollar General, or Walgreens, store regulated products within labeled temperature requirements. Those

- 46 -

products are safe for human use or ingestion and meet requirements as to safety, identity, strength, quality, purity, and effectiveness. Thus, there were safer alternatives, and Plaintiffs would have purchased these Products from Family Dollar's competitors, but for its concealment and omissions.

104.   Based on Family Dollar's statements that the Products should have been "quarantine[d] and discontinue[d] [from] sale" it is clear that the products could not be lawfully sold and had no value.[73]

105.   Even if the Products had any value, that value was substantially diminished because the Products were unsafe for human use or ingestion and failed to meet safety standards and were of a lesser strength, identity, quality, purity, and effectiveness than represented.

106.   Any suggestion that Family Dollar properly offered consumers a means to return the Products is erroneous. At a bare minimum, Family Dollar has an obligation to notify as many customers as possible about the recalls. Upon information and belief, Family Dollar deliberately prevented notice from reaching its customers in order to avoid paying refunds for the Adulterated Products.

107.   Family Dollar has the resources to notify customers if it chose to do so. Family Dollar has at a minimum 15 million customers that it can connect to instantly

---

[73] *See* Exs. D–H ("Family Dollar has notified its affected stores asking them to check their stock immediately and to quarantine and discontinue the sale of any affected product.").

through its Family Dollar Smart Coupons®, which gives consumers news about new products, coupons for saving money, etc. According to Family Dollar, "[i]n early 2021, we introduced our new retail media network, Chesapeake Media Group, which offers our partners the ability to instantly connect with shoppers, including the more than 15 million users registered in the Family Dollar Smart Coupons® program, contributing to purchase decisions in real time."[74] Upon information and belief, this network did not send out notifications regarding recalls or advise customers of a possible refund.

108.   Family Dollar also has at least 15 million email addresses of customers which it could have used to advise customers about recalls and a possible refund. Upon information and belief, customers were not notified by email or through any other source of contact information Family Dollar maintains. Nor did Family Dollar post information about the recalls in visible areas at its retail stores where customers would have seen it.

109.   Further, the actual recalls are fraught with pitfalls that prevent customers from receiving a refund. Each recall requires customers to "return such products to the Family Dollar Store where they were purchased. . . ."[75] Yet, because

---

[74] *See* Dollar Tree, *A New Chapter, 2021 Annual Report*, at 4, Apr. 11, 2022, https://corporate.dollartree.com/_assets/_e019a55beaa640d513e0240de36a677a/dollartreeinfo/db/893/9106/annual_report/DT_2021_Form+10-K_FINAL_5.11.22.pdf.

[75] Company Announcement, Exs. D–H.

these were consumable products, most customers no longer have the actual products or packaging materials necessary to qualify for a refund. Further, none of the recalls list the stores where the Adulterated Products were sold. In fact, the May 4, 2023 recall doesn't even list the states where the products were sold. Moreover, Family Dollar conspicuously omits the words "for a full refund" in all recalls, leading many customers to believe that upon returning the Adulterated Product they would only receive the same identical adulterated product they are returning.

110.    Finally, the sheer number of products listed in the recalls (approximately 779) makes it highly unlikely that a reasonable consumer would spend substantial amounts of time attempting to determine if the products they purchased were recalled. Family Dollar does not provide customers with any way of searching for a product beyond reviewing all 779 recalled products line by line. To make matters worse, the lists also include shorthand descriptions of certain products (e.g., "A H" instead of "Arm & Hammer"; "NPX" instead of "Natureplex"; "Crst" instead of "Crest"; and "DRTALBOT" instead of "DR. TALBOT").

111.    Because of Family Dollar's actions, any recall was a *de minimis* expense in comparison to the millions of dollars of Adulterated Products Family Dollar knowingly and willfully sold to unsuspecting consumers.

112.   As an immediate, direct, and proximate result of Family Dollar's unlawful and unfair conduct, misrepresentations, and omissions, Family Dollar injured Plaintiffs and Class members, in that Plaintiffs and Class members:

  a. purchased Products that were adulterated, could not lawfully be sold, and were unsafe for human use or ingestion, and therefore, are worthless;

  b. paid more for Products based on Family Dollar's false representations, omissions, and deception;

  c. purchased Products they otherwise would not have purchased, had they not been deceived;

  d. purchased Products that they otherwise would not have purchased, had they known the truth about improper storage practices, and the safety and quality issues of the Products;

  e. were not given adequate notice or opportunity to obtain a refund or could not get a refund for the Products purchased; and/or

  f. were deprived of the benefit of the bargain because the Products they purchased were adulterated, had no value, or had less value than what was represented.

## V. TOLLING OF THE STATUTES OF LIMITATION

### A. Discovery rule tolling

113.   Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that the Products they purchased were unlawfully sold by virtue of being stored outside of labeled temperature requirements within the period of any applicable statutes of limitation.

114.   Within the period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered through the exercise of

reasonable diligence that Defendants were concealing that the Products were adulterated, unsafe, and defective by virtue of being stored outside of labeled temperature requirements. Thus, all applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.     Fraudulent concealment tolling**

115.   All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment of the facts alleged herein throughout the period relevant to this action.

116.   Plaintiffs and the other Class members justifiably relied on Family Dollar to disclose that the Products were adulterated by virtue of being stored outside of labeled temperature requirements, and because this was hidden and not discoverable through reasonable efforts by Plaintiff and the other Class members, the running of all applicable statutes of limitation have been suspended with respect to any of Plaintiffs' and other Class members' claims.

**C.     Estoppel**

117.   Defendants were under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Adulterated Products.

118.   Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Products from consumers, as well as the fact that

- 51 -

the Products could not lawfully be sold and that storage of the products outside of labeled temperature requirements systematically devalued the Products.

119.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## VI.   CLASS ALLEGATIONS

120.   Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals (the "Class" or "Classes") pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law, consumer protection, and other statutory laws of the states listed below, on behalf of the following class or classes:

> **New York Class:** All persons who purchased an Adulterated Product from a Family Dollar store in New York from May 1, 2022, through the present.
>
> **Arkansas Class:**  All persons who purchased an Adulterated Product from a Family Dollar store in Arkansas from May 1, 2022, through the present.
>
> **Illinois Class:**  All persons who purchased an Adulterated Product from a Family Dollar store in Illinois from May 1, 2022, through the present.
>
> **Kentucky Class:**  All persons who purchased an Adulterated Product from a Family Dollar store in Kentucky from May 1, 2022, through the present.
>
> **Louisiana Class:**  All persons who purchased an Adulterated Product from a Family Dollar store in Louisiana from May 1, 2022, through the present.

**Missouri Class:**  All persons who purchased an Adulterated Product from a Family Dollar store in Missouri from May 1, 2022, through the present.

**Oklahoma Class:**  All persons who purchased an Adulterated Product from a Family Dollar store in Oklahoma from May 1, 2022, through the present.

**Tennessee Class:**  All persons who purchased an Adulterated Product from a Family Dollar store in Tennessee from May 1, 2022, through the present.

**Texas Class:**  All persons who purchased an Adulterated Product from a Family Dollar store in Texas from May 1, 2022, through the present.

121.  Excluded from each of the classes above are consumers who allege personal bodily injury resulting from the use of an Adulterated Product. Also excluded are Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

122.  The class definitions identify unnamed Class members by describing a set of common characteristics sufficient to allow a member of that group to identify themselves as having a right to recover damages from Defendants. Other than direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class through notice published online through internet posting and/or publication.

123.   Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief pursuant to common law and the state consumer protection laws identified herein.

124.   Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose subclasses, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

125.   <u>Numerosity—Fed. R. Civ. P. 23(a)(1)</u>. The Class is comprised of tens of thousands of individuals who were Defendants' customers, the joinder of which in one action would be impracticable. The exact number or identification of the Class members is presently unknown. The identity of the Class members is ascertainable and can be determined based on Defendants' business records.

126.   <u>Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3)</u>. The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

> a.   Whether Defendants engaged in the unlawful conduct alleged herein;
>
> b.   Whether Defendants owed a duty of care to Plaintiffs and Class members;

- 54 -

c.     Whether Defendants' representations in advertising, marketing, storing, distributing, and/or selling were unlawful, false, deceptive, and/or misleading;

d.     Whether Defendants mislead Plaintiffs and Class members about its unlawful sales;

e.     Whether Defendants' representations deceived Plaintiffs and Class members;

f.     Whether Defendants were unjustly enriched by their unlawful conduct;

g.     Whether Defendants' actions violate state consumer protection laws;

h.     Whether the Adulterated Products fail under an implied warranty;

i.     Whether Plaintiffs and Class members are entitled to declaratory and injunctive relief;

j.     Whether (and in what amount) Defendants' conduct economically injured Plaintiffs and Class members; and

k.     Whether Plaintiffs and Class members are entitled to the recovery of punitive damages (and in what amount).

127.   Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Class. Identical statutory violations and business practices are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

128.   Typicality—Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of the members of the Class in that they are based on the same underlying

- 55 -

facts, events, and circumstances relating to Defendants' conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the class. Further, there are no defenses available to Defendant that are unique to Plaintiffs or to any particular Class members.

129.  Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1). Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interest incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

130.  Predominance—Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

131.  Superiority—Fed. R. Civ. P. 23(b)(3). A class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Plaintiffs and members of the Class have suffered irreparable harm as a result of Defendants' unlawful, unfair, fraudulent, and deceptive conduct. Because of the size of the individual Class members' claims, no Class Member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the

unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

132.   Plaintiffs do not anticipate any difficulty in the management of this litigation.

## VII.   CAUSES OF ACTION

**A.     Multistate Claims**

### COUNT I

### NEGLIGENCE
**(on behalf of the State Classes)**

133.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

134.   At all times relevant herein, Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in the marketing, quality control, storage, distribution, and selling of the Adulterated Products, including a duty to follow FDCA requirements by storing the Products within labeled temperature requirements, and by not selling the Adulterated Products.

011231-12/2448713 V1

135.   Defendants also owed a duty to Plaintiffs and Class members not to unlawfully sell the Products that were unsafe for human use or consumption and defective.

136.   Defendants also owed a duty to Plaintiffs and Class members to advise them of their right to a refund, and to ensure that stores carried out the refund program.  The recalls are otherwise meaningless if Plaintiffs and Class members are not advised of their rights to a refund.

137.   Defendants breached their duties to Plaintiffs and Class members by (a) unlawfully storing the Products outside of labeled temperature requirements; (b) unlawfully selling the Adulterated Products that were not safe for human use or consumption; (c) marketing, storing, distributing, selling, and warranting Adulterated Products which did not meet safety standards and were of a lesser strength, identity, quality, purity, and effectiveness than was represented to Plaintiffs and Class members; (d) failing to take those steps necessary to discontinue storing and/or selling the Adulterated Products to consumers, and (e) failing to adequately advise customers of their rights to a refund.

138.   Despite the ability and means of the Defendants to properly store, distribute, and sell products that met FDCA requirements as to safety, identity, strength, quality, purity, and effectiveness, Defendant failed to do so.

- 58 -

139.   When Plaintiffs and Class members purchased the Adulterated Products, they were unaware that the Products could not lawfully be sold and were therefore unsafe for human use or consumption and lacked the identity, strength, quality, purity, and effectiveness as were marketed by Defendants.

140.   After their purchase, and following the recalls, Plaintiffs and Class members were unaware of their rights to a refund, and Family Dollar was negligent in executing its own recall program.

141.   As a direct and proximate cause of the foregoing, Plaintiffs and Class members have suffered, and will continue to suffer, damages and economic loss as described herein.

142.   Plaintiffs and the Class members are entitled to damages in an amount to be determined at trial.

## COUNT II

### NEGLIGENCE *PER SE*
### (on behalf of the State Classes)

143.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

144.   Defendants owed a duty to Plaintiffs and Class members to abide by all applicable federal and state statutes, laws, and regulations regarding regulated products.

145.   Defendants had a duty to comply with 21 U.S.C. § 331, *et seq.*, which prohibits the introduction of adulterated products into interstate commerce. *See* FDCA, 21 U.S.C. § 331.

146.   In particular, the FDA-regulated products held by Defendants at their warehouses and distribution centers were adulterated through Defendants' actions of storing these products outside of labeled temperature requirements, introducing them into interstate commerce, and selling the Adulterated Products in violation of 21 U.S.C. § 331, *et seq*. *See* 21 U.S.C. § 351.

147.   Additionally, Defendants violated the States' respective consumer protection statutes as alleged herein by, among other things: 1) willfully concealing that the affected Products were stored outside of labeled temperature requirements; 2) willfully selling Adulterated Products that could not lawfully be sold and were therefore unsafe for human use and consumption; 3) failing to disclose and actively concealing that the Adulterated Products could not lawfully be sold and did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness; 4) representing that the Adulterated Products had characteristics, uses, benefits, and qualities which they did not have; 5) representing that the Adulterated Products are of a particular standard, quality and grade when they are were not; 6) intentionally and knowingly misrepresenting material facts regarding the Adulterated Products; and (7) failing to advise customers of their rights to a refund.

148.   The fact that Defendants failed to comply with FDCA requirements, and similar state statutes regarding product safety, identity, strength, quality, purity, and effectiveness is evidence that Defendants breached their duty of reasonable care and is negligence *per se*.

149.   Plaintiffs and Class members were in the class of people intended to be protected by these statutes regarding product safety. Defendants' failure to comply with these statutes was a direct and proximate cause of Plaintiffs' and Class members' injuries and damages.

150.   Plaintiffs and Class members suffered injury and damages as a direct and proximate result of Defendants' acts and omissions constituting negligence *per se*.

## COUNT III

### NEGLIGENT FAILURE TO WARN
### (on behalf of the State Classes)

151.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

152.   Defendants, as the seller of the Adulterated Products, had a duty to Plaintiffs and the Classes to exercise the same degree of care, diligence, and skill to adequately warn and/or instruct them that the Adulterated Products could not lawfully be sold, were unsafe for human use or consumption, did not meet

requirements as identity, strength, quality, purity, and effectiveness, and were not fit for their intended purpose as other sellers would have exercised.

153.   Defendants negligently failed to warn that the Products could not lawfully be sold, were unsafe for human use or consumption, did not meet requirements as to identity, strength, quality, purity, and effectiveness, and were not fit for their intended purpose. Specifically, the improper storage practices, unlawful sales, and safety risks to Plaintiffs and Class members. Such negligent conduct was a proximate cause of injuries sustained by Plaintiffs and the Classes.

154.   Defendants were in a position superior to that of Plaintiffs and the Classes to be aware of the conditions and qualities of the Adulterated Products, as set forth herein. Thus, Defendants had an obligation to inform Plaintiffs and the Classes of their improper storage practices and unlawful sales practices. Further, Defendants had a superior opportunity to inspect its warehouses and distribution centers and become aware of the improper storage practices over and above Plaintiffs and the Classes.

155.   The absence of adequate warnings and instructions caused injury-in-fact and damages to Plaintiffs and the Classes that the Defendant knew or should have known about in the exercise of ordinary care. Defendants breached said duty, and negligently failed to warn Plaintiffs and the Classes of the improper storage practices and unlawful sales practices.

011231-12/2448713 V1

156.   Plaintiffs and Class members would not have purchased the Adulterated Products had they known the truth about the unlawful sale of the Adulterated Products and that the Adulterated Products were unsafe for human use or consumption, and were defective.

157.   As a direct and proximate cause of the foregoing, Plaintiffs and Class members have suffered and will continue to suffer damages.

**COUNT IV**

**NEGLIGENT MISREPRESENTATION**
**(on behalf of the State Classes)**

158.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

159.   The acts and omissions of Defendants described herein were done with conscious disregard of the rights of Plaintiffs and Class members.

160.   These representations were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase the Products.

161.   Defendants made identical misrepresentations and omissions to members of the class regarding the Products. Defendants should have known their representations to be false and had no reasonable grounds for believing them to be true when they were made.

- 63 -

162.   By and through such negligent misrepresentations, Defendants intended to induce Plaintiffs and those similarly situated to purchase the Products.

163.   Plaintiffs and those similarly situated relied to their detriment on Defendants' negligent misrepresentations. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) the Products.

164.   Plaintiffs and those similarly situated have suffered economic damages. In particular, Plaintiffs seek to recover on behalf of themselves and those similarly situated the full price paid for the worthless Adulterated Products.

## COUNT V

## UNJUST ENRICHMENT
### (on behalf of the State Classes)

165.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

166.   As a result of Defendants' wrongful and deceptive conduct alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of money paid by the Plaintiffs and members of the Classes when they purchased the Adulterated Products.

167.   In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Class.

011231-12/2448713 V1

168.   As a result, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

169.   Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

170.   Defendants either knew or should have known that the payments rendered by Plaintiffs and Class members were given and received with the expectation that the Adulterated Products would have the qualities, characteristics, and suitability for use represented by Defendants and that ordinarily pass in the trade. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

171.   The financial benefits derived by Defendants from obtaining and retaining Plaintiffs' property rightfully belongs to Plaintiffs and members of the Class.

172.   Defendants failed to advise customers of their rights to a refund, thereby allowing Defendants to retain the profits of their ill-gotten gains.

173.   Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and Class members.

- 65 -

174.   Plaintiffs and Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## COUNT VI

## BREACH OF IMPLIED WARRANTY
### (on behalf of the State Classes)

175.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

176.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

177.   The Adulterated Products are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiffs and Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

178.   Each Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

179.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

180.   There was a sale of goods from Defendants to Plaintiffs and Class members.

181.   As set forth herein, Defendants marketed, distributed, and sold the Adulterated Products, and prior to the time the Adulterated Products were purchased by Plaintiffs and Class members, Defendants impliedly warranted to them that they were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made on the Adulterated Products' packages and labels, which they did not.

182.   Plaintiffs and Class members relied on Defendants' promises and affirmations of fact.

183.   Contrary to these representations and warranties, the Adulterated Products were not fit for their ordinary use and did not conform to Defendants' representations.

184.   Defendants breached the implied warranties by knowingly selling to Plaintiffs and Class members products that did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness and were not fit for their intended purpose.

185.   Defendants were on notice of this breach, as they were aware the Adulterated Products were not stored within labeled temperature requirements and did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

- 67 -

186.   Plaintiffs and Class members are the intended beneficiaries of Defendants' implied warranties and Plaintiffs and Class members did not alter the Adulterated Products.

187.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered actual damages in that they purchased the Adulterated Products that are worthless or worth less than the price they paid and that they would not have purchased any of the products had they known the actual quality of the Adulterated Products.

**B.    Claims brought on behalf of the New York Class**

**COUNT VII**

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. Gen. Bus. Law § 349)**

188.   Plaintiffs Dana Berkley and Nina Pallman ("Plaintiffs," for purposes of all New York Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

189.   Plaintiffs bring this Count on behalf of the New York Class members.

190.   Plaintiffs are "persons" within the meaning of New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

191.   Defendants are each a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

192.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Defendants' deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing the Adulterated Products, constitute conduct directed at consumers and are "consumer-oriented." Further, Plaintiffs and other Class members suffered injury as a result of the deceptive acts or practice, including Defendants' failure to adequately advise Plaintiffs of their right to a refund.

193.   Defendants' actions, as set forth above, occurred in the conduct of business, trade, or commerce.

194.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs Berkley and Pallman and the members of the New York Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues; Defendants thus violated the New York GBL.

- 69 -

195.   Defendants owed the New York Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a.   Possessed exclusive knowledge of the condition of the Adulterated Products;

b.   Intentionally concealed the foregoing from the New York Class members; and/or

c.   Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from the New York Class members that contradicted these representations.

196.   Defendants failed to reveal facts that were material to Plaintiffs Berkley and Pallman and the members of the New York Class's decisions to purchase the Products, and Defendants intended that Plaintiffs Berkley and Pallman and the members of the New York Class would rely upon the omissions.

197.   In addition, Defendants failed to adequately advise Plaintiffs of their right to a refund pursuant to the recalls.

198.   For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored

outside of labeled temperature requirements, and that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

199. Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

200. Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

201. Plaintiffs Berkley and Pallman and the members of the New York Class were deceived by Defendants' claims that, *inter alia*, that "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

202. Defendants' actions impact the public interest because Plaintiff Berkley and the members of the New York Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception.

203. Had Plaintiffs Berkley and Pallman and the members of the New York Class known the truth about the Products, they would not have purchased the Products.

204.   Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs and each Class member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendants' willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under the New York GBL.

## COUNT VIII

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. Gen. Bus. Law § 350)

205.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

206.   Plaintiffs bring this Count on behalf of the New York Class members.

207.   New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

208.   Defendants caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable

care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

209.   Defendants have violated N.Y. Gen. Bus. Law § 350 because of the misrepresentations and omissions alleged herein which were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs Berkley and Pallman and the members of the New York Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues, Defendants violated New York GBL.

210.   Defendants owed the New York Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a.     Possessed exclusive knowledge of the condition of the Adulterated Products;

b.     Intentionally concealed the foregoing from the New York Class members; and/or

c.     Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from the New York Class members that contradicted these representations.

211.    Defendants failed to reveal facts that were material to Plaintiffs Berkley and Pallman and the members of the New York Class's decisions to purchase the Products, and Defendants intended that Plaintiffs Berkley and Pallman and the members of the New York Class would rely upon the omissions.

212.    In addition, Defendants failed to adequately advise Plaintiffs of their right to a refund pursuant to the recalls.

213.    For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements, and that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

214.    Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

215.    Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

216.    Plaintiffs Berkley and Pallman and the members of the New York Class were deceived by Defendants' claims that, *inter alia*, that "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

217.    Defendants' actions impact the public interest because Plaintiffs Berkley and Pallman and the members of the New York Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception.

218.    Had Plaintiffs Berkley and Pallman and the members of the New York Class known the truth about the Products, they would not have purchased the Products.

**C.       Claims Brought on Behalf of the Arkansas Class.**

**COUNT I**

**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT
(ARK. CODE ANN. § 4-88-101 *ET SEQ.*)**

219.    Plaintiffs (for purposes of all Arkansas Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

220.    This claim is brought on behalf of the Arkansas Class members.

221.    Defendants, Plaintiffs, and Arkansas Class members are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

- 75 -

222.   The "Adulterated Products" are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

223.   The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108.

224.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the members of the Arkansas Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues; Defendants thus violated the Arkansas DTPA.

225.   Defendants owed the Arkansas Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a. Possessed exclusive knowledge of the condition of the Adulterated Products;

b. Intentionally concealed the foregoing from the Arkansas Class members; and/or

c. Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from the Arkansas Class members that contradicted these representations.

226. Defendants failed to reveal facts that were material to Plaintiffs and the members of the Arkansas Class's decisions to purchase the Products, and Defendants intended that Plaintiffs and the members of the Arkansas Class would rely upon the omissions.

227. In addition, Defendants failed to adequately advise Plaintiffs of their right to a refund pursuant to the recalls.

228. For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements; that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

229. Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the

Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

230.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

231.   Plaintiffs and the members of the Arkansas Class were deceived by Defendants' claims that, *inter alia*, "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

232.   Defendants' actions impact the public interest because Plaintiffs and the members of the Arkansas Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception

233.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

234.   Plaintiffs and the Class seek monetary relief against Defendant in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because Defendant engaged in aggravated and outrageous conduct with an evil mind. Indeed, Defendant carried out despicable conduct with willful and conscious

disregard of the rights of others. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

235.   Plaintiffs also seek attorneys' fees and any other just and proper relief available.

**D.     Claims Brought on Behalf of the Illinois Class.**

**COUNT I**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 *ET SEQ.* AND 720 ILCS 295/1A)**

236.   Plaintiff Sandy Selesky ("Plaintiff," for purposes of all Illinois Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

237.   Plaintiff brings this Count on behalf of the Illinois Class members.

238.   Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

239.   Plaintiff and the Illinois Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

240.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment,

- 79 -

suppression, or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

241.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiff and the members of the Illinois Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues; Defendants thus violated the Illinois CFA.

242.   Defendants owed the Illinois Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a.   Possessed exclusive knowledge of the condition of the Adulterated Products;

b.   Intentionally concealed the foregoing from the Illinois Class members; and/or

c.   Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from the Illinois Class members that contradicted these representations.

243.   Defendants failed to reveal facts that were material to Plaintiff and the members of the Illinois Class's decisions to purchase the Products, and Defendants intended that Plaintiff and the members of the Illinois Class would rely upon the omissions.

244.   In addition, Defendants failed to adequately advise Plaintiff and the members of the Illinois Class of their right to a refund pursuant to the recalls.

245.   For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements; that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

246.   Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

247.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

248. Plaintiff and the members of the Illinois Class were deceived by Defendants' claims that, *inter alia*, "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

249. Defendants' actions impact the public interest because Plaintiff and the members of the Illinois Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception

250. Defendants' violations present a continuing risk to Plaintiff and members of the Illinois Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

251. Pursuant to 815 ILCS 505/10a(a), Plaintiff and the Illinois Class members seek monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or was grossly negligent.

252. Plaintiff also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1 *et seq.*

- 82 -

**E.      Claims Brought on Behalf of the Kentucky Class.**

## COUNT I

## VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT. ANN. § 367.110 *ET SEQ.*)

253.   Plaintiffs (for purposes of all Kentucky Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

254.   Plaintiffs bring this Count on behalf of the Kentucky Class members.

255.   Defendants, Plaintiffs, and each member of the Kentucky Class are "person[s]" within the meaning of the Ky. Rev. Stat. Ann. § 367.110(1).

256.   Defendants engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

257.   The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. § 367.170(1). Defendants participated in misleading, false, or deceptive acts that violated the Kentucky CPA. Accordingly, Defendants engaged in deceptive business practices prohibited by the Kentucky CPA.

258.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the members of the Kentucky Class, acting reasonably under the circumstances, to

- 83 -

their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues; Defendants thus violated the Kentucky CPA.

259.   Defendants owed the Kentucky Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

      a.   Possessed exclusive knowledge of the condition of the Adulterated Products;

      b.   Intentionally concealed the foregoing from the Kentucky Class members; and/or

      c.   Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from the Kentucky Class members that contradicted these representations.

260.   Defendants failed to reveal facts that were material to Plaintiffs and the members of the Kentucky Class's decisions to purchase the Products, and Defendants intended that Plaintiffs and the members of the Kentucky Class would rely upon the omissions.

261.   In addition, Defendants failed to adequately advise Plaintiffs of their right to a refund pursuant to the recalls.

- 84 -

262.   For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements; that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

263.   Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

264.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

265.   Plaintiffs and the members of the Kentucky Class were deceived by Defendants' claims that, *inter alia*, "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

266.   Defendants' actions impact the public interest because Plaintiffs and the members of the Kentucky Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception.

267. Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs and the Class seek to recover actual damages in an amount to be determined at trial; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

**F.     Claims Brought on Behalf of the Louisiana Class.**

**COUNT I**

**VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. STAT. ANN. § 51:1401 *ET SEQ.*)**

268. Plaintiffs Margarite Sampson and Casandra Maynard ("Plaintiffs," for purposes of all Louisiana Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

269. Plaintiffs bring this Count on behalf of the Louisiana Class members.

270. Defendants, Plaintiffs, and Louisiana Class members are "persons" within the meaning of the La. Stat. Ann. § 51:1402(8).

271. Plaintiffs and Louisiana Class members are "consumers" within the meaning of La. Stat. Ann. § 51:1402(1).

272. Defendants engaged in "trade" or "commerce" within the meaning of La. Stat. Ann. § 51:1402(9).

273. The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "unfair or deceptive acts or practices in the

- 86 -

conduct of any trade or commerce." La. Stat. Ann. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that violated Louisiana CPL.

274.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the members of the Louisiana Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues; Defendants thus violated the Louisiana CPL.

275.   Defendants owed the Louisiana Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a.   Possessed exclusive knowledge of the condition of the Adulterated Products;

b.   Intentionally concealed the foregoing from the Louisiana Class members; and/or

c.   Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from the Louisiana Class members that contradicted these representations.

276.   Defendants failed to reveal facts that were material to Plaintiffs and the members of the Louisiana Class's decisions to purchase the Products, and

Defendants intended that Plaintiffs and the members of the Louisiana Class would rely upon the omissions.

277.   In addition, Defendants failed to adequately advise Plaintiffs of their right to a refund pursuant to the recalls.

278.   For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements; that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

279.   Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

280.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

281.   Plaintiffs and the members of the Louisiana Class were deceived by Defendants' claims that, *inter alia*, "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

- 88 -

282.    Defendants' actions impact the public interest because Plaintiffs and the members of the Louisiana Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception.

283.    Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Class members overpaid for their Adulterated Products and did not receive the benefit of their bargain, and their Adulterated Products have suffered a diminution in value. There injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

284.    Pursuant to La. Stat. Ann. § 51:1409, Plaintiffs and the Louisiana Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Stat. Ann. § 51:1409.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520, 2524)

285.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

286.   Plaintiffs bring this Count on behalf of the Louisiana Class members.

287.   Defendants were a merchant with respect to over-the-counter medications and medical devices within the meaning of the La. Civ. Code Art. 2520, 2524.

288.   Under La. Civ. Code Art. 2520 and 2524, a warranty that the Adulterated Products did not have redhibitory defects was implied by law in the transactions when Plaintiffs purchased or leased their Adulterated Products from Defendants.

289.   The Adulterated Products, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which products are used. The Adulterated Products had a redhibitory defect. In being inherently defective and adulterated, the Adulterated Products' use is so inconvenient that it must be presumed that a buyer would not have bought it had he or she known of their adulterated condition, or would have paid substantially less for it.

290.   Defendants were provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

291.   As a direct and proximate result of Defendants' breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**G.     Claims Brought on Behalf of the Missouri Class.**

**COUNT I**

**VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*)**

292.   Plaintiffs (for purposes of all Missouri Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

293.   Plaintiffs bring this Count on behalf of the Missouri Class against Defendants.

294.   Defendants, Plaintiffs, and the Missouri Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

295.   Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

296.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or

omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. Defendants used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA.

297.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the members of the Missouri Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues; Defendants thus violated the Missouri MPA.

298.   Defendants owed the Missouri Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a.      Possessed exclusive knowledge of the condition of the Adulterated Products;

b.      Intentionally concealed the foregoing from the Missouri Class members; and/or

c.      Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while

purposefully withholding material facts from the Missouri Class members that contradicted these representations.

299.   Defendants failed to reveal facts that were material to Plaintiffs and the members of the Missouri Class's decisions to purchase the Products, and Defendants intended that Plaintiffs and the members of the Missouri Class would rely upon the omissions.

300.   In addition, Defendants failed to adequately advise Plaintiffs of their right to a refund pursuant to the recalls.

301.   For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements; that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

302.   Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

303.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

304.    Plaintiffs and the members of the Missouri Class were deceived by Defendants' claims that, *inter alia*, "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

305.    Defendants' actions impact the public interest because Plaintiffs and the members of the Missouri Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception.

306.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

307.    Defendants are liable to Plaintiffs and the Missouri Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

**H.     Claims Brought on Behalf of the Oklahoma Class.**

## COUNT I

### VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15, § 751 *ET SEQ.*)

308.    Plaintiffs (for purposes of all Oklahoma Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

309.    Plaintiffs bring this Count on behalf of the Oklahoma Class members.

- 94 -

310.   Plaintiffs and the Oklahoma Class members are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), Okla. Stat. tit. 15, § 752.

311.   Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15 § 15-751(1).

312.   The sale or lease of the Adulterated Products to the Oklahoma Class members was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and Defendants' actions as set forth herein occurred in the conduct of trade or commerce.

313.   The Oklahoma CPA declares unlawful, inter alia, the following acts or practices when committed in the course of business: (1) "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics, . . . uses, [or] benefits, of the subject of a consumer transaction;" (2) making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another;" (3) "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and (4) otherwise committing "an unfair or deceptive trade practice."   Okla. Stat. tit. 15, § 753. Defendants participated in misleading, false, or deceptive acts that violated the Oklahoma CPA.

314.   Defendants' actions, as set forth herein, occurred in the conduct of trade or commerce.

315.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the members of the Oklahoma Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues; Defendants thus violated the Oklahoma CPA.

316.   Defendants owed the Oklahoma Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a.   Possessed exclusive knowledge of the condition of the Adulterated Products;

b.   Intentionally concealed the foregoing from the Oklahoma Class members; and/or

c.   Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from the Oklahoma Class members that contradicted these representations.

317.   Defendants failed to reveal facts that were material to Plaintiffs and the members of the Oklahoma Class's decisions to purchase the Products, and

011231-12/2448713 V1

Defendants intended that Plaintiffs and the members of the Oklahoma Class would rely upon the omissions.

318.   In addition, Defendants failed to adequately advise Plaintiffs of their right to a refund pursuant to the recalls.

319.   For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements; that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

320.   Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

321.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

322.   Plaintiffs and the members of the Oklahoma Class were deceived by Defendants' claims that, *inter alia*, "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

- 97 -

323. Defendants' actions impact the public interest because Plaintiffs and the members of the Oklahoma Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception.

324. Defendants' violations present a continuing risk to Plaintiffs and the members of the Oklahoma Class, as well as to the general public; indeed, the unlawful acts and practices complained of herein affect the public interest.

325. Defendants' conduct as alleged herein was unconscionable because (1) Defendants, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; and (2) Defendants knew or had reason to know that the transaction Defendants induced the consumers to enter into were excessively one-sided in favor of Defendants.

326. Because Defendants' unconscionable conduct caused injury to Oklahoma Class members, Plaintiffs and the Oklahoma Class seek recovery of actual damages, discretionary penalties up to $2,000 per violation, punitive damages, and reasonable attorneys' fees, under Okla. Stat. tit. 15, § 761.1. Plaintiffs and Oklahoma Class members further seek an order enjoining Defendants' unfair and/or

deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## I.      Claims Brought on Behalf of the Tennessee Class.

### COUNT I

### VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT (TENN. CODE ANN. § 47-18-101 *ET SEQ.*)

327.   Plaintiffs Alecia Bowens and Terrance Montgomery ("Plaintiffs," for purposes of all Tennessee Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

328.   Plaintiffs bring this Count on behalf of the Tennessee Class members.

329.   Plaintiffs and Tennessee Class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

330.   Defendants are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(2).

331.   Defendants' conduct complained of herein affected "trade," "commerce" and/or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

332.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "(5) Representing that goods or services have . . . characteristics, [or] . . . benefits . . . that they do not have;"

- 99 -

"(7) Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" "(9) Advertising goods or services with intent not to sell them as advertised;" and "(27) Engaging in any other act or practice which is deceptive to the consumer or any other person." Tenn. Code Ann. § 47-18-104. Defendants violated Tennessee CPA by engaging in unfair or deceptive acts.

333.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the members of the Tennessee Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues; Defendants thus violated the Tennessee CPA.

334.   Defendants owed the Tennessee Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a.   Possessed exclusive knowledge of the condition of the Adulterated Products;

b.   Intentionally concealed the foregoing from the Tennessee Class members; and/or

c.   Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while

- 100 -

purposefully withholding material facts from the Tennessee Class members that contradicted these representations.

335.   Defendants failed to reveal facts that were material to Plaintiffs and the members of the Tennessee Class's decisions to purchase the Products, and Defendants intended that Plaintiffs and the members of the Tennessee Class would rely upon the omissions.

336.   In addition, Defendants failed to adequately advise Plaintiffs of their right to a refund pursuant to the recalls.

337.   For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements; that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

338.   Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

339.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

- 101 -

340.   Plaintiffs and the members of the Tennessee Class were deceived by Defendants' claims that, *inter alia*, "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

341.   Defendants' actions impact the public interest because Plaintiffs and the members of the Tennessee Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception

342.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

343.   Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs and the Tennessee Class members seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, attorney's fees, and any other just and proper relief available under the Tennessee CPA.

**J.      Claims brought on behalf of the Texas Subclass**

**COUNT IX**

**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-
CONSUMER PROTECTION ACT ("DTPA")
(Tex. Bus. & Com. Code §§ 17.41, *et seq.*)**

344.    Plaintiffs Etoya Garrett, Shakia Means, and Farah Sanders ("Plaintiffs," for purposes of all Texas Counts) incorporate by reference all paragraphs as though fully set forth herein.

345.    Plaintiffs assert a claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46.

346.    Plaintiffs are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.46(4).

347.    Defendants engaged in "trade or commerce" within the meaning of the DTPA.

348.    The DTPA prohibits "false, misleading, or deceptive acts or services in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a). By their acts, omissions, failures, and conduct described in this Complaint, each Defendant has violated Tex. Bus. & Com. Code § 17.46(b)(1), (2), (5), (7), (9), (12)

(13), (20), and (24). Each Defendant participated in unfair and deceptive trade practices that violated the DTPA as described herein.

349.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the members of the Texas Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues, Defendants violated Texas DTPA.

350.   Defendants owed the Texas Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a.     Possessed exclusive knowledge of the condition of the Adulterated Products;

b.     Intentionally concealed the foregoing from the Texas Class members; and/or

c.     Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from the Texas Class members that contradicted these representations.

351.   Defendants failed to reveal facts that were material to Plaintiffs and the members of the Texas Class's decisions to purchase the Products, and Defendants

- 104 -

intended that Plaintiffs and the members of the Texas Class would rely upon the omissions.

352.   In addition, Defendants failed to adequately advise Plaintiffs and the members of the Texas Class of their right to a refund pursuant to the recalls.

353.   For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements, and that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

354.   Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

355.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

356.   Plaintiffs and the members of the Texas Class were deceived by Defendants' claims that, *inter alia*, that "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

357.   Defendants' actions impact the public interest because Plaintiffs and the members of the Texas Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception.

358.   Had Plaintiffs and the members of the Texas Class known the truth about the Products, they would not have purchased the Products.

359.   Plaintiffs and Texas Class members seek monetary relief against Defendants pursuant to Tex. Bus. & Com. Code §§ 14.41, et seq. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and mental anguish damages and additional damages up to three times the amount of economic damages as permitted by the DTPA.

360.   On or around February 21, 2024, Plaintiffs made a demand in satisfaction of Tex. Bus. & Com. Code § 17.505(a) on behalf of themselves and similarly situated Texas Class members acquirers relating to the Adulterated Products and the Texas Class members' demand that Defendants correct or agree to correct the actions described therein. Plaintiffs file the instant complaint for notice purposes and to allege additional claims, and reserve the right to amend this count if Defendants do not remedy or rectify Plaintiffs' injuries as alleged herein within the statutory period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this case be certified and maintained as a class action and for a judgment to be entered upon Defendants as follows:

A.    certify the Class or Classes as proposed herein, designating Plaintiffs as Class representatives, and appointing undersigned counsel as Class Counsel;

B.    award economic and compensatory damages on behalf of Plaintiffs and all Class members;

C.    award all actual, general, special, incidental, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.    award treble damages pursuant to law, and all other actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

E.    order injunctive relief, compelling Defendants to cease their unlawful actions and to account to Plaintiffs for their unjust enrichment;

F.    award reasonable attorneys' fees, reimbursement of all costs for the prosecution of this action, and pre-judgment and post-judgment interest; and

G.    grant such other and further relief this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action so triable.

011231-12/2448713 V1

DATED: March 8, 2024          Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By  *s/ Nathaniel Tarnor*
     Nathaniel Tarnor, Bar No. 701931
68 3rd Street, Suite 249
Brooklyn, NY 11231
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
nathant@hbsslaw.com

Steve W. Berman (admission pending)
steve@hbsslaw.com
Jerrod C. Patterson (admission pending)
jerrodp@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Gerald M. Abdalla, Jr.
(*pro hac vice* pending)
**ABDALLA LAW, PLLC**
602 Steed Road, Suite 200
Ridgeland, MS 39157
Telephone: (601) 278-6055
jerry@abdalla-law.com

*Attorneys for Plaintiffs and the Proposed Class
Counsel for Plaintiff*

011231-12/2448713 V1